OWENS CORNING FIBERGLAS CORP.,
Appellant/Cross–Appellee–Defendant,

v.

David COBB and Melissa Hinds, As Personal Representatives of the Estate of Kenneth Cobb, Deceased, Appellees/Cross–Appellants–Plaintiffs.

No. 49A04–9801–CV–46.

Court of Appeals of Indiana.

July 22, 1999.

George E. Purdy, George T. Patton, Jr., Stephanie F. Holtzlander, J. Taggart Birge, Bose McKinney & Evans, Indianapolis, Indiana, Attorneys for Appellant/Cross Appellee.

Julia Blackwell Gelinas, Nelson D. Alexander, T. Joseph Wendt, Locke Reynolds Boyd & Weisell, Indianapolis, Indiana, James D. Johnson, Mattingly, Rudolph, Fine & Porter, L.L.P., Evansville, Indiana, Attorneys for Amicus Curiae Defense Trial Counsel of Indiana.

Nancy G. Endsley, Landman & Beatty, Indianapolis, Indiana, Linda George, Russel W. Sipes, Laudig, George, Rutherford & Sipes, Indianapolis, Indiana, Allard A. Allston, III, Ness, Motley, Loadholt, Richardson & Poole, Barnwell, South Carolina, Attorneys for Appellees/Cross Appellants.

William R. Groth, Fillenwarth Dennerline Groth & Towe, Indianapolis, Indiana, Attorney for Amicus Curiae Indiana State AFL–CIO.

James O. McDonald, Everett, Everett & McDonald, Max E. Goodwin, Hansford C. Mann, Bruce D. Aukerman, Mann Law Firm, Terre Haute, Indiana, Attorneys for Amicus Curiae Indiana Trial Lawyers Association.

## OPINION

BROOK, Judge

### Case Summary[1]

Appellant/cross-appellee-defendant Owens Corning Fiberglas Corp. ("OC") appeals from an adverse judgment for $544,682 in compensatory damages and $1,634,046 in punitive damages arising from an asbestos product liability claim. More specifically, OC appeals several pre-trial rulings on motions for summary judgment with respect to nonparty defenses and product identification and for leave to amend its answer to include nonparty defenses. Appellee/cross-appellant-plaintiff Kenneth Cobb ("Cobb"), through the personal representatives of his estate, appeals the trial court's award of damages. Cobb claims that Indiana's Tort Claims Act unconstitutionally limits his right to punitive damages and argues that his compensatory damages should not have been offset by amounts received from settlements with other defendants.

### Facts and Procedural History

On July 24, 1996, Cobb filed a complaint against more than 30 manufacturers or distributors of asbestos, seeking both compensatory and punitive damages under "product liability theories of negligence, strict liability and breach of warranty." Cobb had smoked cigarettes for 45 years and was "exposed to asbestos and asbestos-containing material" for about 41 years, from 1954 to 1995; this exposure occurred during his career as a pipefitter at numerous job sites and for several different employers. He was diagnosed with asbestosis in 1989 and with lung cancer on September 12, 1995. In July 1996, Cobb was informed that his lung cancer had metastasized to his brain; he therefore sought and was granted an expedited jury trial.

OC filed its answer on August 19, 1996, asserting 34 affirmative defenses to Cobb's complaint. Among these were # 34, in which OC reserved the right to object to any settlement and subsequent dismissal of any defendant and to amend its answer to "specifically delineate those defendants as settling nonparty defendants, to request that the court add those defendants to any verdict form submitted to the jury, and to claim credit for any amounts received by the plaintiff from those defendants."

Cobb eventually settled with some defendants, and other defendants entered into

---

1. Oral argument in this case took place at Valparaiso University School of Law. The students, faculty, and staff who attended the argument were able to watch appellate advocacy at its finest. This Court publicly expresses its gratitude to the administration of the Valparaiso University School of Law for the opportunity to share this rich and rewarding experience with the faculty, students, and staff of the law school.

stipulations of dismissal with Cobb. In a letter to defendants dated April 30, 1997, Cobb listed the names of those defendants who had been dismissed from the case. Cobb's deposition was taken by defense counsel on September 11, 18, and 19, 1997.

On September 26, 1997, Cobb filed a motion for partial summary judgment against OC as to its affirmative defenses, asserting that OC had not presented sufficient evidence to support them. That same day, OC filed a motion for summary judgment "based upon lack of product identification," along with designated evidence and a supporting memorandum; OC argued that Cobb had "failed to provide any evidence that he was exposed to asbestos-containing products manufactured or distributed" by OC. OC filed a motion for leave to amend its answer on October 15, 1997, stating that it had first learned of Cobb's settlements with other defendants in a letter dated October 6, 1997.[2] OC requested to add the names of those defendants to its affirmative defense # 34, in addition to adding two more affirmative defenses relating to the Johns–Manville Trust Agreement and other entities who "caused or contributed" to Cobb's injuries and had not yet been joined as defendants.

On October 15, 1997, OC also filed a petition in opposition to Cobb's motion for partial summary judgment as to the affirmative defenses. OC alleged that Cobb had been exposed to asbestos-containing products manufactured by approximately a dozen non-parties, and that these allegations constituted material issues of fact sufficient to preclude summary judgment in Cobb's favor. On October 16, 1997, Cobb filed a response to OC's motion for summary judgment; on October 20, 1997, he filed a reply to OC's response to his motion for partial summary judgment. On October 22, 1997,[3] Cobb filed a response to OC's motion for leave to amend its answer, arguing that OC was barred from adding most of the non-parties identified in its motion because of the time restrictions contained in Ind.Code § 34–4–33–10(c):[4]

A nonparty defense that is known by the defendant when the defendant files the defendant's first answer shall be pleaded as a part of the first answer. A defendant who gains actual knowledge of a nonparty defense after the filing of an answer may plead the defense with reasonable promptness. However, if the defendant was served with a complaint and summons more than one hundred fifty (150) days before the expiration of the limitation of action applicable to the claimant's claim against the nonparty, the defendant shall plead any nonparty defense not later than forty-five (45) days before the expiration of that limitation of action. The trial court may alter these time limitations or make other suitable time limitations in any manner that is consistent with:

(1) giving the defendant a reasonable opportunity to discover the existence of a nonparty defense; and

(2) giving the claimant a reasonable opportunity to add the nonparty as an additional defendant to the action before the expiration of the period of limitation applicable to the claim.

On October 28, 1997, the trial court denied without comment OC's motion for summary judgment based upon lack of product identification. That same day, OC filed a motion for an order to strike Cobb's punitive damage prayers and claims and a motion for leave to amend its answer, in addition to filing its second amended answer and affirmative defenses.[5] On November 4, 1997, the trial court granted Cobb's motion for partial summary judgment as it related to OC's affirmative defenses "with the exception of the defense of contributory fault." The trial court granted OC's motion to amend its answer only with respect to the nonparty defense of

---

**2.** OC claims that it never received the so-called "April Letter" mentioned above; however, we need not address this contention here.

**3.** The filing date is not readily ascertainable, but the document was dated by Cobb's counsel on October 22, 1997.

**4.** Recodified as IND.CODE § 34–51–2–16 in 1998.

**5.** The record does not contain an order ruling on OC's motion to strike Cobb's punitive damage prayers and claims; because Cobb was awarded punitive damages, we can only presume that the trial court denied OC's motion.

nonparty Rutland Fire Clay and denied it in all other respects without comment.

A jury trial commenced on November 4, 1997, and concluded on November 12, 1997; at the conclusion of the evidence, OC withdrew its nonparty defense against Rutland Fire Clay. The jury awarded Cobb $679,782 (later amended to $689,782 to correct a typographical error) in compensatory damages, which was offset by $145,100 that had previously been paid to Cobb by other defendants. The jury also awarded Cobb $15,000,000 in punitive damages and $100 in court costs.

On November 14, 1997, OC filed its first motion to correct errors, claiming that the punitive damage award was excessive and subject to the statutory cap limitations contained in IND.CODE § 34–4–34–4:[6]

A punitive damage award may not be more than the greater of:

(1) three (3) times the amount of compensatory damages awarded in the action; or

(2) fifty thousand dollars ($50,000).

On November 14, 1997, OC filed its second motion to correct errors, requesting the court to grant a new trial on the issue of damages or to grant remittitur. OC claimed that the compensatory damage award was excessive and "clearly erroneous as contrary to and not supported by the evidence." On November 19, 1997, Cobb filed a motion to correct error in judgment amount, contending that the $689,782 assessed against OC should not have been offset by the $145,100 that Cobb had received from settlements with other defendants because the jury had found OC to be 100% at fault.

On December 16, 1997, the trial court granted OC's first motion to correct errors and denied its second motion. The trial court reduced the punitive damage award to three times $544,682, or $1,634,046, which resulted in a total judgment of $2,178,828, including $100 in court costs. The trial court granted a stay of enforcement of judgment pending OC's appeal and Cobb's cross-appeal.

**Issues**

OC raises several issues for review, only one of which is dispositive: namely, whether the trial court erred in denying OC's motion for summary judgment for lack of product identification.

### Discussion and Decision

#### I. Summary judgment— standard of review

■ When reviewing the denial of a summary judgment motion, this Court applies the same standard as the trial court. *Morton v. Moss,* 694 N.E.2d 1148, 1151 (Ind. Ct.App.1998). "We resolve any doubt as to any fact, or inference to be drawn therefrom, in favor of the non-moving party." *Id.* We must determine whether a genuine issue of material fact exists and whether the trial court has correctly applied the law. *Id.* "A fact is material for the purpose of ruling on a motion for summary judgment only when its existence facilitates resolution of any of the issues involved." *Id.* Even though there may be conflicting facts and inferences on some elements of a claim, "summary judgment is appropriate when there is no dispute with regard to facts which are dispositive of the litigation." *Id.* As the party appealing the denial of summary judgment, OC bears the burden of persuading this Court that the trial court's ruling was improper. *Id.*

■ "Summary judgment is appropriate only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." *Colen v. Pride Vending Service,* 654 N.E.2d 1159, 1162 (Ind.Ct.App.1995), *trans. denied* (1996); Ind. Trial Rule 56(C). T.R. 56(C) provides in relevant part:

At the time of filing the motion or response, a party shall designate to the court all parts of pleadings, depositions, answers to interrogatories, admissions, matters of judicial notice, and any other matters on which it relies for purposes of the motion. A party opposing the motion shall also designate to the court each material issue of fact which that party asserts precludes entry of summary judgment and the evidence relevant thereto.

---

**6.** Recodified as IND.CODE § 35–51–3–4 in 1998.

The moving party must first make "a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law." *Luider v. Skaggs*, 693 N.E.2d 593, 595 (Ind. Ct.App.1998), *trans. denied*. Once the movant clears this procedural hurdle, the non-moving party then bears the burden of setting forth "specifically designated facts showing the existence of a genuine issue." *Id.* "When the defendant makes a motion for summary judgment supported by materials contemplated by T.R. 56, the plaintiff may not rest on her pleadings, but must set forth specific facts controverting the claim for summary judgment, using supporting materials contemplated by the rule." *Colen*, 654 N.E.2d at 1162–1163. Summary judgment may be granted if the plaintiff fails to meet this burden. *See id.* at 1163.

▮▮▮ In considering OC's appeal on the issue of product identification and causation, it is instructive to examine the following principles outlined in *Colen*:

> Our analysis proceeds from the premise that summary judgment is rarely appropriate in negligence actions[.][7] Nevertheless, a defendant is entitled to judgment as [a] matter of law when undisputed material facts negate at least one element of plaintiff's claim[.]
>
> Negligence cannot be established by inferential speculation alone[.] An expert's opinion that something is "possible" or "could have been" is insufficient by itself to support a material factual question[.] Testimony based on conjecture or speculation is insufficient to support a claim[.] Qualitatively, evidence fails when it cannot be said reasonably that the intended inference may logically be drawn therefrom[.] The failure of an inference may occur as a matter of law when the intended inference can rest on no more than speculation or conjecture[.]

654 N.E.2d at 1162–1163. We further note that an essential element in a negligence action "is the requirement of a reasonable connection between a defendant's conduct and the damages which the plaintiff has suffered." *Roberson v. Hicks*, 694 N.E.2d 1161, 1163 (Ind.Ct.App.1998), *trans. denied*. "This element requires, at a minimum, causation in fact—that is, that the harm would not have occurred 'but for' the defendant's conduct." *Id.* "The plaintiff's burden may not be carried with evidence based merely upon supposition or speculation." *Id.*

## II. OC's designation of evidence in support of its motion for summary judgment based upon lack of product identification

▮▮▮ As noted above, a party moving for summary judgment is required to make a prima facie showing that no genuine issues of material fact exist. *Luider*, 693 N.E.2d at 595. The movant "must demonstrate the absence of any genuine issue of fact as to a determinative issue" before the non-movant is required to present contrary evidence. *Jarboe v. Landmark Comm. Newspapers*, 644 N.E.2d 118, 123 (Ind.1994). In its supporting memorandum, OC argued that Cobb had "failed to provide any evidence proving that he was exposed to asbestos-containing products manufactured or distributed" by OC and therefore could not prove that any "asbestos-containing product manufactured" by OC was responsible for his illness. In support of its motion, OC designated several pages from Cobb's September 19, 1997, deposition, which reads in relevant part as follows:[8]

Q  Have you ever heard of a product called Kaylo?

A  Yes.

Q  What is that product as far as you recall?

A  It's pipe covering insulation.

Q  Do you associate that product with any manufacturer?

A  The Kaylo is associated with Owens–Corning.

Q  Have you personally ever installed Kaylo?

---

**7.** Omitted citations from this excerpt are indicated as "[.]" for purposes of legibility.

**8.** The excerpted material may be found at pages 165, 169, 172, and 175–176 of Cobb's deposition. Cobb's answers are indicated by "A."

A  No.

Q  Have you personally ever removed Kaylo, to your knowledge?

A  Well, I have removed pipe covering that has not been identified or a brand name on it. So when I remove it, I have no idea who manufactured it.

Q  Sir, have you ever, to your knowledge, been on a job site where Kaylo was being installed?

A  Yes.

Q  And do you believe that on those job sites you were exposed to any airborne asbestos particles?

A  If the insulators are installing pipe covering and I'm working in the same area as [page break—testimony cut off].

Q  Let's go on, then, sir, you mentioned numerous IPS schools?

A  Yes.

Q  When do you recall first being on an IPS school site where you believe Kaylo was being installed?

A  It would have been 1963 or 1964.

Q  Which school do you recall, if at all?

A  I don't.

Q  You don't?

A  No.

Q  Who were you working for at that time, sir?

A  Indianapolis Public Schools.

Q  Directly for them?

A  Yes.

Q  In what capacity?

A  As a steamfitter.

Q  And tell me what you recall occurring with reference to OCF Kaylo at that time.

A  I don't really understand what you asked.

Q  Sure. Was OCF Kaylo present somewhere where you worked?

A  Yes, if I was in the school and there were insulators working around me, they were using some of that, and they were also at [page break—testimony cut off].

Q  So sometimes the [insulators'] work was done and you weren't around them?

A  Right.

Q  Sometimes you would be around them for one or two hours at a time?

A  Yes. . . .

Q  So is there anything more you can add to what you've told me about OCF Kaylo?

A  As I recall today, no.

Q  And the reason, if I'm understanding your testimony, that you can identify Kaylo today is by the boxes that you saw?

A  Yes.

Q  You never ordered that product, I take it?

A  No.

Q  Sir, any other job sites that you can recall being on or you saw OCF Kaylo or where you believe it was being installed?

A  At this time today I can't remember a particular place where I would have seen it being installed.

Q  Thank you, sir. Just one other question. Did you ever, in your career, install any type of insulation that you believe contained asbestos?

A  It would be involving repair work where I've been in working on the piping, and to have access to the pipe, I would have to cut the insulation off. Then when we made the repair, I would put the insulation back on. That's the only time I've ever installed insulation.

Q  It would be fair to say that you would not be able to identify who manufactured that insulation?

A  No, not—once it's been put on the job site, they don't stamp their brand name on the pipe covering.

Q  So it would be fair to say you couldn't identify it?

A  As per se Kaylo?

Q  Yes. That's a fair statement?

A  I beg your pardon?

Q Is that a fair statement that you couldn't identify it?

A Yes....

In construing the above evidence in favor of Cobb as the nonmoving party, we can conclude only that Cobb *may* have been exposed to Kaylo asbestos fibers at some time during his work for Indianapolis Public Schools. There is no evidence whatsoever that Cobb actually installed or removed Kaylo himself, and there exists only the *possibility* that the insulators installed or removed Kaylo when Cobb was present at an undetermined job site. To further conclude that the insulators' work actually released Kaylo asbestos fibers into the air and that Cobb actually inhaled those fibers into his lungs would require an even more tenuous reliance on mere inferences, not facts. Finally, to conclude that Kaylo asbestos fibers actually caused Cobb's injuries would stretch the chain of logic to the breaking point. Cobb cited a Seventh Circuit asbestos case to support his argument,[9] but we need look no further than *Roberson* to establish that Cobb's burden to prove causation "may not be carried with evidence based merely on supposition or speculation." 694 N.E.2d at 1163. Because OC's designated evidence shows that there was no genuine issue of material fact with respect to the causation of Cobb's injuries, the burden then passes to Cobb to establish the contrary. *See Jarboe*, 644 N.E.2d at 123.

### III. Cobb's designation of evidence in support of its response to OC's motion for summary judgment

Excerpts from Cobb's brief confirm that his claims of exposure to OC's Kaylo at the summary judgment stage were based solely on conjecture and speculation:

A review of the facts and inferences from the evidence designated by OC construed in favor of the nonmovant, [Cobb], allows the conclusion that there is a genuine issue of material fact regarding [Cobb]'s exposure to OC's asbestos containing product, Kaylo. [Cobb] testified that Kaylo is a pipe covering insulation.... [Cobb] testified that Kaylo had been present at a job site where he worked.... [Cobb] testified that he removed pipe covering, but that the pipe covering he removed did not have a brand name on it.... It can be inferred from these facts that the pipe covering removed by [Cobb] was Kaylo and that the act of removing the pipe covering exposed [Cobb] to OC's asbestos containing Kaylo....

[Cobb] testified that he saw boxes on his job site that had the words "Owens Corning" and "Kaylo" printed on them.... It can be inferred that the boxes of Kaylo [Cobb] saw on his job site were used for pipe covering insulation and that [Cobb] could have been exposed to the Kaylo in the course of his work with the pipes.

Appellees'/cross-appellants' brief at 32–33.

Cobb's evidence in support of his response to OC's summary judgment motion, though voluminous, fails to demonstrate a genuine issue of material fact as to whether Cobb was ever actually exposed to Kaylo asbestos fibers, let alone whether exposure to Kaylo caused his injuries. The strongest evidence designated by Cobb is contained in his September 19, 1997, deposition:[10]

---

**9.** *See Harris v. Owens–Corning Fiberglas Corp.*, 102 F.3d 1429, 1434 (7th Cir.1996) (plaintiff responding to OC's summary judgment motion failed to carry "burden of identifying evidence sufficient to support an inference that her husband inhaled asbestos from [OC's Kaylo], as opposed to other manufacturers' asbestos products"). Although we do not reach the question of adopting a specific test for causation in asbestos cases, the dissent advocates the adoption of the "job site" test as stated in *Peerman v. Georgia–Pacific Corp.*, 35 F.3d 284 (7th Cir.1994). We believe, however, that *Peerman* applies the same standard as *Harris:* namely, that a plaintiff " 'must produce evidence sufficient to support an inference that he inhaled asbestos dust from the defendant's product.' " *Harris*, 102 F.3d at 1432, quoting *Peerman*, 35 F.3d at 287. Consequently, we believe that the "job site" test, as mentioned in *Peerman* and applied in *Richoux v. Armstrong Cork Corp.*, 777 F.2d 296 (5th Cir. 1985), is in fact a less stringent standard that "only requires proof that the asbestos-containing product was used at a job site at a time when the plaintiff was employed at that job site." *Peerman*, 35 F.3d at 286.

**10.** The excerpted material may be found at pages 165–166 and 169–170 of Cobb's deposition. Cobb's answers are indicated by "A."

Q  Have you personally ever removed Kaylo, to your knowledge?

A  Well, I have removed pipe covering that has not been identified or a brand name on it. So when I remove it, I have no idea who manufactured it.

Q  Sir, have you ever, to your knowledge, been on a job site where Kaylo was being installed?

A  Yes.

Q  And do you believe that on those job sites you were exposed to any airborne asbestos particles?

A  If the insulators are installing pipe covering and I'm working in the same area as they are, yes, I would have been exposed to some airborne particles.

Q  Do you believe, sir, that the times that you were around Kaylo, that it contained asbestos?

A  Yes, due to the dates and times....

Q  Let's go on, then, sir, you mentioned numerous IPS schools?

A  Yes.

Q  When do you recall first being on an IPS school site where you believe Kaylo was being installed?

A  It would have been 1963 or 1964.

Q  Which school do you recall, if at all?

A  I don't.

Q  You don't?

A  No....

Q  Was OCF Kaylo present somewhere where you worked?

A  Yes, if I was in the school and there were insulators working around me, they were using some of that, and they were also at times using Armstrong.

Q  That's what I want to know, sir. So let's take a step back. Is it your testimony that while you worked at IPS as a steamfitter, only Armstrong products and OCF Kaylo products were used to insulate?

A  They both were used. At this point in time, I can't say that something else wasn't used.

Q  Tell me how you know OCF Kaylo was used.

A  As I would be around the job site, I would see the boxes.

Q  And what would you notice on the boxes? What printing did you see?

A  Owens–Corning and the Kaylo.

Although Cobb's testimony places an undetermined number of boxes containing Kaylo at an undetermined number of job sites at which he worked, it contains no facts from which the trial court could conclude that Cobb had been exposed to Kaylo asbestos fibers—whether from work performed by Cobb himself or by others. If anything, the additional deposition pages designated by Cobb actually strengthen OC's assertion that Cobb's exposure claim was based solely on conjecture—especially when one considers that the insulators also used Armstrong products when working in Cobb's vicinity. Certainly, one could draw the inference that Cobb was exposed to Kaylo asbestos fibers if Kaylo was installed or removed in his presence, but we strongly reiterate that an inference may fail as a matter of law when it "can rest on no more than speculation or conjecture." *Colen,* 654 N.E.2d at 1163. Without concrete facts to support his inference of exposure, Cobb cannot show the existence of a genuine issue of material fact regarding OC's causation of his injuries. Therefore, the trial court erred in denying OC's motion for summary judgment based upon lack of product identification.[11]

### Conclusion

The trial court's judgment in favor of Cobb is reversed, and this cause is remanded to the trial court with instructions to vacate its order denying OC's motion for summary judgment based upon lack of product identifi-

**11.** OC notes that Indiana courts have not adopted a standard for product identification in asbestos cases. Because our holding is based on a general analysis of summary judgment and causation issues, we need not address the advis- ability of adopting a specific standard for product identification in asbestos cases. Finally, in reversing the trial court's judgment, we need not consider Cobb's arguments regarding punitive damages and setoffs raised on cross-appeal.

cation and to enter an order granting OC's motion.

Reversed and remanded with instructions.

STATON, J., concurs.

RILEY, J., dissents with opinion.

RILEY, Judge, dissenting

I dissent. Cobb has produced sufficient evidence to support an inference that he inhaled asbestos dust from the Owens–Corning product on the job site. This inference was made when Cobb showed that Kaylo, as it was used during his tenure at IPS, did produce a significant amount of asbestos dust and that Cobb could have inhaled the asbestos dust while he was at work.

Cobb was a steam fitter for IPS between 1963 and 1965. While he was on the job sites doing pipe repair, he would work with the insulators who were actually covering the pipes with asbestos material. At times he would be working next to them and at other times he would be several feet away from them.

Q  In the course of the insulation, did you ever see dust created by the products that the insulators were using?

A  On a new construction job, yes, there's always dust.

Q  New construction within IPS?

A  Well, some of it would be new construction with IPS, some of it would be—what do I want to say—remodel work or—it could have been remodel work.

Q  And when you were in the area with these people, were you exposed to dust that they were creating during the course of their insulation duties?

A  Yes.

Q  What type of activity would they engage in that created the most amount of dust?

A  Probably pipe covering.

Q  And how would the dust be created?

A  As they cut it and as they put it on the piping, and as they would seal the edges, just the handling of it.

Q  Do you recall how close you were to these insulators as they were covering the pipe?

A  I could have been within two feet of them. I could have been within 40 feet of them.

Q  Do you recall any specific product names that you saw the AC & S insulators using?

A  Primarily Armstrong.

Q  Do you remember any other particular types of Armstrong products you might have seen on the work site?

A  Well, I remember the Kaylo ...[12]

When a trial court grants summary judgment its decision is presumed valid and will be affirmed if sustainable on any theory. *Prall v. Indiana National Bank,* 627 N.E.2d 1374, 1376 (Ind.Ct.App.1994). The evidence designated by both parties establishes a genuine issue of material fact that only a jury could determine.

In the summary judgment standard of review cited by the majority, Cobb need only make a showing sufficient to establish the existence of each challenged element upon which he has the burden of proof. Under this standard, Cobb has made a sufficient showing to allow the conclusion that there is a genuine issue of material fact regarding Cobb's exposure to OC's asbestos containing product, Kaylo. OC has not established the absence of a question of fact on the outcome-determinative issue of causation.

I believe it is important to first analyze the differences in summary judgment standards between Indiana and federal practice as enunciated by our supreme court in *Jarboe v. Landmark Community Newspapers of Indiana,* 644 N.E.2d 118, 123 (Ind.1994).

Indiana's summary judgment procedure abruptly diverges from federal summary judgment practice. Under the federal rule, the party seeking summary judgment is not required to negate an opponent's claim. The movant need only inform the

---

**12.** The excerpted questions and answers are found at pages 218–222 of Cobb's deposition.

court of the basis of the motion and identify relevant portions of the record 'which it believes demonstrate the absence of a genuine issue of material fact.' *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.E[d].2d 265, 272. The burden then rests upon the non-moving party to make a showing sufficient to establish the existence of each challenged element upon which the non-movant has the burden of proof. *Id.* Indiana does not adhere to *Celotex* and the federal methodology.

The burden in federal court rests upon the non-moving party to make a showing sufficient to establish the existence of each challenged element upon which the non-movant has the burden of proof. Indiana does not adhere to this methodology. Merely alleging that Cobb has failed to produce evidence of causation, an essential element to Cobb's case, is insufficient to entitle Owens–Corning to summary judgment under Indiana law. Here, Cobb has made a sufficient showing on the essential element of causation to which he bears the burden of proof at trial. The dictate of *Jarboe* is consistent with the recognition that summary judgment terminates the right to trial and that summary judgment will be denied even though it appears that the plaintiff may not succeed at trial. *Greathouse v. Armstrong,* 616 N.E.2d 364, 365–366 (Ind.1993).

Although neither this court nor the supreme court has adopted a test for causation in asbestos cases, the "job site" test for causation as stated in *Peerman v. Georgia–Pacific Corp.,* 35 F.3d 284, 287 (7th Cir.1994) best fits our summary judgment standard. It holds that a plaintiff need not produce evidence of actual exposure to the product alleged to have caused an asbestos-related disease, but must produce enough evidence to support an inference that he inhaled asbestos dust from the *defendant's* product. *Id.*

*Harris v. Owens–Corning Fiberglas Corp.,* 102 F.3d 1429 (7th Cir.1996) holds that a claim survives a dispositive motion only if it can be established that the OC's product caused the person's illness. To adopt such a standard in asbestos cases in Indiana is contrary to our summary judgment procedure that diverges from the federal summary practice. Indiana does not permit a summary judgment to be used as an abbreviated trial. *Flott v. Cates,* 528 N.E.2d 847, 848 (Ind.Ct.App.1988). To adopt the *Harris* standard is to conclude in a summary fashion that the Kaylo product was not the cause of death.

Instead, we must adopt the *Peerman* standard that is in line with summary judgment practice in Indiana, allowing a material issue of fact to be tried by a jury. Cobb has produced enough evidence to support an inference that he inhaled asbestos dust from the Kaylo product. The standard does not require that Kaylo was the *only* product on the job site. Drawing all reasonable inferences in favor of the non-moving party, Cobb has identified Kaylo as a product on the job site that could have possibly produced a significant amount of asbestos dust that he could have inhaled during his tenure at IPS. I would affirm the trial court's order denying OC's motion for summary judgment.