MONNIER *v.* CENTRAL GREYHOUND LINES, INC. ET AL.

[No. 18,599.   Filed November 2, 1955.]

*Armstrong, Gause, Hudson and Kightlinger, Erle A. Kightlinger,* of Indianapolis, *Harold M. Bode* (of counsel), of Kenosha, Wisconsin, and *Elmore S. McCray,* of Valparaiso, for appellant.

*Ryan, Chester & Clifford,* of Valparaiso, for appellees.

KELLEY, J.—Action by appellant for damages for personal injuries allegedly sustained by her on August 29, 1949, as the result of the alleged negligent operation by appellee, Edwin Curtis, of a bus owned by appellee, Central Greyhound Lines, Inc., in which appellant was at the time a fare-paid passenger.

By way of answer, appellees pleaded appellant's executed release for $1,585.00 paid her by appellee, Central Greyhound Lines, Inc., on July 19, 1950. Appellant replied, in avoidance of said release, in effect, that at the time of the execution of the same she was mentally incompetent and of unsound mind, that said release was procured by duress of appellee, Greyhound Lines, and that a mistake existed at the time said release was executed as to her true physical condition. Appellees' answers to said replies and their additional plea of limitations closed the issues.

Trial by jury was invoked. At the conclusion of appellant's evidence in chief, the court, upon appropriate motion, directed the jury to return a verdict for the appellee, Indiana Greyhound Lines, Inc., which was done. No question appears with reference thereto.

At the time of the alleged execution by appellant of said release, three checks or drafts were drawn by the

agent of appellee, Central Greyhound Lines, Inc., acting for and on the latter's behalf, one for $1,116.00, payable to the order of appellant, individually, another for $352.00, payable jointly to the order of appellant and the Clinic, Inc., and the third for $117.00, payable jointly to the order of appellant and Dr. B. M. Kohrman. The Clinic, Inc., appears from the record to be a hospital in Michigan City, Indiana, to which appellant was taken from the scene of the accident, and Dr. Kohrman, a physician in attendance at said hospital, who rendered appellant medical services. Appellant retained the said first check payable to her order, and endorsed each of the others, and the same were forwarded or delivered by said agent to the Clinic, Inc., and Dr. B. M. Kohrman, respectively. The latter two drafts were thereafter duly cashed and paid.

These three checks or drafts purport to comprise and aggregate the total adjustment of $1,585.00 for which the release was given. Appellant never cashed said $1,116.00 draft and made tender of it to the appellee corporation on July 18, 1951, the same being one year after the execution by her of the release. No restoration or tender of the amount represented by the said two joint drafts was ever made and is so admitted by appellant.

At the conclusion of all the evidence, the court, upon motion of the two remaining appellees, directed the jury to return a verdict in their favor, and the jury, accordingly, returned a verdict for each of said appellees.

Appellant appeals from the judgment rendered against her on the verdicts and assigns as error the overruling of her motion for new trial.

The action of the trial court in directing verdicts for said appellees, Central Greyhound Lines, Inc., and

Edwin Curtis, gives rise to and poses for our determination the correctness thereof.

Appellant maintains that there was sufficient evidence in support of the allegations of her reply that immediately prior to and at the time of signing the release she was "because of her psychoneurotic condition" "mentally incompetent and of unsound mind, and incapable of managing and handling her own affairs, and being thereby incapable of understanding said release and contracting thereto," and that she "was entitled to have the matter considered . . . by a jury."

Appellant's said contention seems to be predicated upon the erroneous theory that her act of executing the release and endorsing the said two joint drafts, were absolutely void, and not merely voidable. Such theory runs counter to the rule long established by our courts, as will be seen by the cases hereinafter cited.

Appellant did not allege in her reply, nor does our examination of the record disclose any evidence tending to prove that she, prior to, at, or subsequent to the execution of said release contract, was ever judicially found and determined to be a person of unsound mind, or that she was then or since under guardianship as such a person. Nor do we find any allegation in her reply or evidence establishing that her sanity has been restored.

"It is settled by the decisions of this court, that the acts or deeds of a person of unsound mind, whose unsoundness of mind has not been judicially ascertained, and who is not under guardianship, . . . are voidable merely, and not absolutely void, and are subject to ratification or disaffirmance upon the removal of the disability." *Hardenbrook et al.* v. *Sherwood, Guardian* (1880), 72 Ind. 403, 407.

Our courts have uniformly held that to avoid the

effect of a release such as that here involved, it must be promptly disaffirmed *in toto* and restoration ■ made of everything of value received in consideration thereof. *The Louisville, New Albany and Chicago Railway Company* v. *Herr* (1893), 135 Ind. 591, 35 N. E. 556; *The Citizens Street Railroad Company* v. *Horton* (1897), 18 Ind. App. 335, 48 N. E. 22; *Indianapolis Abattoir Company* v. *Bailey* (1913), 54 Ind. App. 370, 102 N. E. 970; *South Bend and Mishawaka Gas Company et al.* v. *Jensen* (1914), 182 Ind. 557, 105 N. E. 774; *Bailey* v. *Indianapolis Abattoir Company* (1918), 66 Ind. App. 465, 118 N. E. 374; *Crane Company et al.* v. *Newman* (1941), 111 Ind. App. 273, 37 N. E. (2d) 732; *Norwood* v. *Erie Railroad Company, Incorporated* (1944), 114 Ind. App. 526, 53 N. E. (2d) 189.

In *The Louisville, New Albany and Chicago Railway Company* v. *Herr* (1893), *supra,* the reply of the appellee alleged that at the time of the agreement he was *non compos mentis,* owing to disturbance of his nervous system from the accident complained of, and that appellant well knew of his mental condition when the agreement was procured. The court said, in part: "There is no question but that contracts, executed or executory, may be avoided on the ground that the maker was of unsound mind, but what it necessary to accomplish the avoidance? Here the contract alleged was executed by one not under guardianship, and not judicially determined to be of unsound mind. The contract was more than an executory one, it was executed in part. Such contracts are not void, but are merely voidable, and to avoid them it is necessary that they shall be disaffirmed. (Citing cases.) . . . The reply does not allege that after the execution of the contract the appellee's reason was restored . . . . Such res-

toration and disaffirmance, or continued unsoundness of mind and disaffirmance by guardian, are necessary to the sufficiency of a plea in avoidance of a contract."

It follows that appellant is in the position of contending that she established herself to be a person of unsound mind, without a guardian or a judicial determination thereof, but with no evidence of the recovery or restoration of her sanity. Under the circumstances, the recovery of her sanity was essential to the validity of any disaffirmance of the contract attempted by her. *The Louisville, New Albany and Chicago Railway Company* v. *Herr, supra*. Such disaffirmance *in toto* and the restoration of everything of value she received for her release was a condition precedent to her right to maintain her action. *The Citizens Street Railroad Company* v. *Horton, supra.*

If it be assumed that there was sufficient evidence to establish that appellant's unsoundness of mind existed only at and immediately prior to her execution of the release and resulted from a temporary or transient cause, and that the jury could infer from all the circumstances shown by the evidence that she had recaptured her reason sufficiently to attempt disaffirmance, nevertheless, the same end is arrived at, for she admits that she did not restore or offer to restore to appellee the amount of the two joint drafts. Such disaffirmance and restoration, as we have observed, was a condition precedent to the submission of her cause.

Appellant, seemingly upon the theory that the jury could have inferred the restoration of her sanity, insists that she is relieved of the rigor of the stated rule of restoration and advances as her primary insistence that the obligations for the payment of which said two joint drafts were issued by the corporation appellee were in fact obligations of the latter and that

there was sufficient evidence to carry the case to the jury on that question.

As has been already demonstrated, the full restoration of the consideration or thing of value received for a release of the nature here involved is a condition precedent to the maintenance of an action for the rescission of a contract or the avoidance of the bar raised by the pleading of the release. If the indebtedness liquidated by means of the two said joint drafts was indebtedness owing by appellant to the physician and the clinic, then appellant received the benefit thereof and, under the authorities, she was required to restore the same. To ascertain this fact we are required to examine the evidence.

At one point in her argument appellant makes reference to a designated page in the record as containing evidence from which the jury could have concluded that the physician and the Clinic, Inc., were "actually acting for and on behalf of the appellees." We have carefully read said record citation, but fail to glean therefrom the evidentiary material which assertedly gave rise to the conclusion expressed by appellant.

A painstaking perusal of the entire record leads us to the conviction that the evidence establishes that the indebtedness due the physician and Clinic, Inc., was the obligation of appellant. We quote, in part, from the direct examination of appellant:

"Q. Were you rendered a bill for your care at the hospital at the time when you left the hospital?

A. I had an insurance with the Blue Cross.

Q. I am asking you if you were rendered a bill by the hospital for anything *you owed them* at that time?

A. Yes, sir.

Q. And did you pay the bill at that time?

A. No."

From the direct examination of appellant as a rebuttal witness, we quote:

"Q. What if anything was said at that time about paying the hospital bill and the doctor bills at Michigan City?

A. No, I don't recall any of the bills. *The doctor give me their bills* and *I had made arrangements with them to pay my bills.*" (Our emphasis.)

Such recognition of the obligations and arrangement by appellant to pay the same, as shown by her own testimony, manifestly was inconsistent with any conviction she now claims to have then entertained that said obligations were those of appellees. Her statement that she "had made arrangements with them to pay my bills" is consistent with and holds nothing to denote a means or method of payment different from that which was actually utilized. We are satisfied by the record that appellant received that part of the consideration for the release represented by the said two joint drafts.

Appellant advances several self-contained propositions in the argument portion of her brief and argues therefrom that by reason of certain asserted circumstances she was not bound by the stated rule. We will set forth each of said propositions, as we understand it, together with our consideration thereof.

1. Appellant states that the fact that the drafts were made to joint payees and showing on their face that they were in settlement of hospital and medical services "sustain the conclusion that the Appellee bus company was paying an obligation it considered it had to the Doctor and the Clinic," and rendered it impossible for appellant to make a tender.

The two untendered drafts, having been endorsed by appellant and cashed by the respective creditors,

served as a means of discharging appellant's obligation. That the drafts were issued in the joint names of appellant and the creditor and bespoke on their face the purpose thereof would not, we think, under the circumstances, serve to afford a foundation for a conclusion that the releasee was thereby paying its own indebtedness. And the fact that a part of the consideration was advanced by the releasee to a third person to whom appellant was indebted for services did not relieve her from the duty of restoration. See: *Supreme Council of Knights and Ladies of Columbia* v. *Apman et al.* (1907), 39 Ind. App. 670, 80 N. E. 640, and particularly point 3 on page 674 of the official reports, wherein the court held that to make the complaint sufficient on the theory of fraud in obtaining it and for cancellation of the release, the complaint should have shown a return or tender of the money advanced by the releasee to an undertaker for services in the burial of the releasor's wife. Appellant fails to disclose upon what ground or for what reason it was impossible for her to restore the amounts of the two joint drafts.

2. Appellant alleges that appellees knew of "the financial situation of appellant" and that "she would have insufficient funds to repay these amounts."

Appellant calls to our attention no evidence concerning appellees' alleged knowledge of her financial situation and inability to repay the amount of the joint drafts. Her reply did not allege nor did the evidence show, insofar as our examination reflects, that her asserted financial condition and inability to restore resulted from any act or conduct of the appellees. The court, in *Bailey* v. *Indianapolis Abattoir Company* (1918), *supra*, held that in the absence of some showing that the "inability to restore"

resulted from the defendant's conduct, the plaintiff's assertion lacked "the essential element of equity necessary to justify the court in relieving him (plaintiff) from the duty to restore before proceeding to recover damages for the original injury." That rule is applicable here and seems to dispose of this proposition.

3. Appellant next proposes that "this is a proper situation for the application of the familiar rule of permitting the jury to take such payments into consideration and to give credit therefor in the final verdict."

Appellant cites no authority to sustain the "familiar rule" she speaks of. If her contention be upheld as a general rule, settlements of unliquidated claims, particularly in tort actions for personal injuries, would be frequently but an idle ceremony, for he who would part with his money to avoid litigation and mutually adjust claims of an unascertained amount would have no assurance that thereafter, when the memory of honest witnesses is beclouded by the lapse of time or they are no longer available, an unprincipled releasor might assert fraud and, with nothing to lose and a possibility of gain, harass the foolish settlor with claims, demand and expensive litigation.

The established policy of the law to encourage compromise and amicable settlement of conflicting claims would be set at naught by a general rule such as appellant contends for. The unscrupulous releasor being under no duty to restore the consideration he received and being subject only to the possibility of having it set off against any judgment he might recover, could use the very money he received in compromise to prosecute subsequent action and, if unsuccessful therein, force the releasee to further, and probably vain, protracted and expensive legal

action for the attempted recovery thereof. Further, to acquiesce in this proposal of the "familiar rule" advocated by appellant would result in the overthrow of the rule of precedent restoration long established by our Supreme Court. This we are neither inclined nor authorized to do.

4. Lastly, appellant says that a tender of the amount of the two drafts would have been futile and useless in that appellees, having refused tender of the $1,116.00 draft, there is no reason to believe they would have accepted the amounts represented by the two joint drafts.

Appellant's said proposition indicates that she is determining for herself whether the appellee would have accepted a tender of the full amount it paid for the release. It must be borne in mind that, by her own admission, she at no time has tendered to the appellee the. entire amount she received. Her reasoning is to the effect that since appellee rejected the tender by her of a part of the consideration she received, it follows, that appellee would have likewise rejected a tender of the balance. This is purely conjectural and is unsupported by any evidentiary facts and circumstances of which we are aware establishing that a tender of the entire amount would have been rejected by appellee.

Pursued to its ultimate, appellant's theory would provoke absurdity. It is conceivable thereunder that if appellant had tendered appellee one dollar which it refused to accept, she would be thereby relieved of compliance with the established rule and could further prosecute her action upon the basis that from the refusal to accept the tendered one dollar the inference could be drawn that a tender of the full amount would be useless and futile.

In *Heaton* v. *Knowlton et al. Administrators*,

(1876), 53 Ind. 357, an action on a promissory note, the defense was made that the same was procured by false and fraudulent representations, but no restoration or offer to restore the value received for the note was made. The court, citing many cases, said: "A party to a contract cannot treat it as good in part and void in part, but he must affirm it or avoid it as a whole; nor can a contract, either for mistake or fraud, be rescinded in part and affirmed in part, but must be rescinded in toto, or not at all." The court, in *The Citizens Street Railroad Company* v. *Horton, supra,* declared that the above quoted principle from the Knowlton case applied equally to contracts in adjustment of rights growing out of torts.

Appellant, by her contention now under consideration, would circumvent the rule enunciated in the Knowlton and Horton cases, above, by the simple expedient of self-determination that the rejection of a partial tender evidences and authorizes the inferential conclusion that a tender of the whole would be likewise rejected. Such proposal, of course, is not consonant with the requirement of the rule. A partial tender amounts only to a partial disaffirmance and, under the authorities last cited, fails to meet the requirements of the rule.

We are not unmindful that there are foreign authorities referred to by appellant, which hold contrary to the views here expressed. In this regard we are inclined to the language used by the court in the Horton case, above cited: "An examination of the cases cited by appellee leads us to the conclusion that most of them are distinguishable from the case at bar, and that which are not, are contrary to the decision of our Supreme Court, and are unsound in principle."

Appellant's failure to disaffirm in toto and restore

everything of value she had received for the release constituted an omission to perform the condition precedent to her right to further prosecute the action. Upon becoming apprised thereof, it became the duty of the court to enforce the bar of the unperformed condition. This it did, and we think rightly so, by directing the verdicts for the appellees.

Judgment affirmed.

NOTE.—Reported in 129 N. E. 2d 800.