Fred W. PRALL and Wicks Building Limited Partnership, Appellants–Plaintiffs,

v.

The INDIANA NATIONAL BANK, Appellee–Defendant.

No. 60A04–9302–CV–62.

Court of Appeals of Indiana, Fourth District.

Feb. 2, 1994.

Thomas M. Barr, Nashville, Jerry E. Prall, Jewell, Crump & Angermeier, Columbus, for appellants-plaintiffs.

David E. Wright, David R. Day, Johnson, Smith, Densborn, Wright & Heath, Indianapolis, for appellee-defendant.

CONOVER, Judge.

Appellants–Plaintiffs Fred W. Prall and Wicks Building Limited Partnership (Prall) appeal the trial court's judgment granting summary judgment in favor of The Indiana National Bank (INB).

We affirm.

Prall's sole issue for our review is whether the trial court erred in granting summary judgment.

This case arises from efforts to renovate the Wicks Office Building in Bloomington, Indiana. Prall, the initial promoter of this venture, eventually formed Wicks Building Limited Partnership. In late 1984, Lee and Knoxville Associates became general partners on the project with Prall in a new entity called Wicks Partners.

Wicks Partners obtained a loan of $230,000 to finance the project from INB. Prior to closing on the loan, David Thomas, president of Knoxville Associates and a general partner of Wicks Partners, instructed INB by letter

as to the disbursement of the loan. Among other disbursements, Prall was to receive $50,000 as reimbursement for building expenditures. The letter requested INB deposit the remaining loan proceeds in a checking account, which required the joint signatures of Prall and Thomas, for the purpose of paying necessary construction expenditures.

The loan closed on May 3, 1985. However, there were deficiencies in some of the documentation provided by Wicks Partners so INB was only able to disburse $197,650 of the $230,000. When the time came for Thomas to sign Prall's $50,000 check, he refused. After some words between Prall and Thomas, the loan closing ended.

By the middle of May, 1985, Wicks Partners had corrected the insufficient documentation, and INB disbursed the balance of the loan. Pursuant to instructions from Thomas and an attorney for Knoxville Associates, INB issued a check for $11,969.50 to the Indianapolis law firm of Lowe Gray Steele & Hoffman (Lowe) and a check for $20,380 to Stenz Construction (Stenz), the general contractor for the project.

Shortly thereafter, Prall contacted INB to inquire if any disbursements had been made from the partnership checking account. INB personnel claimed they told Prall about the disbursements and followed the conversation up with an office memo and letter to Prall, detailing the conversation. Prall contends INB personnel told him no disbursements had been made and he never received a letter from INB about the disbursements.

On June 6, 1985, Prall filed suit against INB (the First Lawsuit), alleging INB breached an agreement to pay Prall $50,000.

On July 1, 1985, INB informed Wicks Partners it was declaring a default under the loan because its July interest payment was not paid timely. It made a demand against Prall, as general partner of Wicks Partnership, for $191,998.99, the unpaid principal portion of the loan.

In August of 1985, Prall settled the lawsuit and in the course of that settlement executed a mutual release dismissing his lawsuit with prejudice. In the mutual release, Prall released all claims, known or unknown, against

INB in connection with the Wicks Project. The release stated he had not relied upon any representations by INB in his decision to execute the release. INB released Prall from all obligations as a general partner and guarantor under the loan documents.

Additionally, Prall reached accommodation with his partners in Wicks Partners and was removed as a general partner. He agreed to be paid $300,000 for his partnership interest and all other claims. He received approximately $180,000 that month.

In May, 1990, Prall filed a second lawsuit against INB, complaining he discovered in 1988 that INB had made disbursements to Lowe and Stenz. In his complaint, he alleged (1) breach of contract and fiduciary duty; (2) theft; (3) a pattern of racketeering activity; and (4) fraud.

INB filed a motion for summary judgment. After a hearing on June 23, 1992, the trial court granted INB's motion.

The purpose of summary judgment is to terminate litigation about which there can be no factual dispute and which may be determined as a matter of law. *Wathen v. Greencastle Skate Place, Inc.* (1993), Ind. App., 606 N.E.2d 887, 889. When reviewing the grant of a summary judgment motion, the reviewing court stands in the shoes of the trial court. *Jackson v. Blanchard* (1992), Ind.App., 601 N.E.2d 411, 414. The moving party carries the burden of making a *prima facie* showing: (1) there is no issue as to any material fact and (2) he is entitled to judgment as a matter of law. *Id.* Once these two requirements are met, the burden shifts to the non-movant to show specific facts indicating an issue of material fact. *Smith v. Amli Realty Co.* (1993), Ind.App., 614 N.E.2d 618, 620. In determining whether summary judgment is appropriate, all facts asserted by the nonmoving party are accepted as true and any doubts are resolved in favor of the nonmoving party. *Northern Indiana Public Service Co. v. East Chicago Sanitary Dist.* (1992), Ind.App., 590 N.E.2d 1067, 1071.

On appeal a trial court's grant of summary judgment is clothed with a presumption of validity. *Rosi v. Business Furniture Corp.* (1993), Ind., 615 N.E.2d 431,

434. The appellant bears the burden of proving the trial court erred in determining there are no genuine issues of material fact and the moving party was entitled to judgment as a matter of law. *Id.* The trial court's judgment will be affirmed if sustainable on any theory found in the designated record. *Smith,* 614 N.E.2d at 621.

Prall contends the trial court erred in finding his claims were barred by his release of August, 1985. He presents a two-pronged argument. First, he claims the release related to a different transaction.

The 1985 release Prall signed provided, in pertinent part, as follows:

> The parties do hereby, jointly and severally, on behalf of themselves, their heirs, administrators, executors, successors and assigns, officers, and employees, agents or other representatives, mutually release and discharge each other, absolutely and forever, from any and all claims, demands, damages, actions or causes of action, known or unknown, which they now have or may hereafter acquire, arising out of the Project and any transaction, relationship, agreement or undertaking relating thereto. The parties hereto acknowledge, covenant, and agree that each of them has read this Mutual Release and understand its terms, including the legal consequences, thereof, and that in offering to make, and in making, executing and delivering this Mutual Release, none of them was acting under any duress, undue influence, misapprehension or misrepresentation by any party hereto or any agent, attorney or representative of any party and that this Mutual Release was made, executed and delivered as the free and voluntary act of each party and was given in good faith on the part of each party with full knowledge of all relevant facts and circumstances.
>
> Except as otherwise provided, this document contains the entire agreement between the parties hereto and no representation or promises, other than those contained or referred herein, have been made by any party to any other party to secure the execution of this Mutual Release.

A release is a species of contract which surrenders a claimant's right to prosecute a cause of action. *Lechner v. Reutepohler* (1989), Ind.App., 545 N.E.2d 1144, 1147. Our supreme court has stated that upholding releases serves an important public policy because it facilitates the orderly settlement of disputes. *Indiana Bell Telephone Co., Inc. v. Mygrant* (1984), Ind., 471 N.E.2d 660, 664. Releases are not merely to pay the releasor the first installment on what he should have, leaving the matter open for the releasor to come back for more later. On the contrary, a settlement is made, and a general release taken for the purpose of foreclosing further claims. *Id.*

The interpretation of a release, like any other contract, is determined by the terms of the particular instrument, considered in light of all facts and circumstances. *Huntley v. City of Gary* (1990), Ind.App., 550 N.E.2d 790, 791. Release agreements, like contracts generally, are interpreted as a matter of law, absent some ambiguity. *Citizens Nat. Bk. of Tipton v. Indianapolis Auto Auction* (1992), Ind.App., 592 N.E.2d 1256, 1258. In the absence of ambiguity, the court looks only to the instrument to ascertain the parties' intent. If the contract is ambiguous and the ambiguity arises from extrinsic facts and a genuine issue exists as to those facts, summary judgment is inappropriate. *Id.*

An integration clause of a contract is to be considered as any other contract provision to determine the intention of the parties and to determine if that which they intended to contract is fully expressed in the four corners of the writing. *Franklin v. White* (1986), Ind., 493 N.E.2d 161, 166. The weight to be given to an integration clause will vary, depending on the facts and circumstances of each particular case. Where two sophisticated parties engage in extensive preliminary negotiations, an integration clause may, in fact, reflect their mutual intention to abandon preliminary negotiations in favor of a complete and final statement of the terms of their agreement. *OEC–Diasonics, Inc. v. Major,* 622 N.E.2d 1025, at 1028 (Ind.App. 1993). To decide that an integration clause in a document executed by sophisticated parties was not effective to demonstrate the intentions of the parties would effectively

nullify the usefulness of this devise and deprive all contracting parties of the opportunity to employ this drafting technique. *Id.*

■ Here, although Prall calls the language in the release "boilerplate," he does not contend it was ambiguous or that he agreed to it under economic duress. Furthermore, the facts show Prall was a sophisticated party signing a commercial release. Prall was represented by legal counsel throughout the term of the negotiation of the release. He earned his master's degree in business administration and is a licensed certified public accountant. Currently he is president of Prall & Company, Certified Public Accountants. Thus, in interpreting the release we will look to language of the instrument to determine intent.

Prall's contention the transactions in the First Lawsuit are totally different from the subject of this lawsuit is factually incorrect. In the First Lawsuit, Prall claimed INB breached an agreement to pay him $50,000. He stated the basis for such an alleged agreement is the letter from Thomas instructing INB as to the disbursement of the Wicks Partners' loan proceeds. This current lawsuit alleges INB made disbursements to Lowe and Stenz contrary to the agreement contained in the Thomas letter. It is evident Prall's claims in this lawsuit are for violations of the same alleged agreement that formed the basis for the First Lawsuit. *See Grimm v. F.D. Borkholder Co., Inc.* (1983), Ind.App., 454 N.E.2d 84, 86 (Release given in connection with price reduction for late completion precluded later claim for breach of warranties, negligence, and fraud).

Moreover, no language in the release limits it to only those claims asserted in the First Lawsuit. This suit, even though it relates to the loan disbursements to INB and Stenz,

springs from the project. The clear language of the release states it applies to all and any claims or actions, known and unknown, arising out the Wicks Building project and any transactions or undertaking relating to it.

In his second argument, Prall claims when he inquired as to any disbursements from the loan balance, INB personnel incorrectly informed him none had been made. Thus, he maintains there is a factual question as to existence of fraudulent misrepresentation which precludes summary judgment. Because this is a summary judgment, we assume Prall did not know of the disbursements to Lowe and Stenz when he signed the release.

■ The general principle that fraud vitiates all contracts applies to releases. *Campbell v. Criterion Group,* 621 N.E.2d 342, 345 (Ind.App.1993).[1] The elements of fraud are (1) a material representation of past or existing fact was made (2) which was untrue and known to be untrue by the party making it, or else recklessly made, (3) the other party did in fact rely on the representation, and (4) proximately caused the complaining party injury. *Pugh's IGA v. Super Food Services, Inc.* (1988), Ind.App., 531 N.E.2d 1194, 1197.

■ Whether INB told him the disbursements to Lowe and Stenz had not been made has no bearing upon the enforceability of the release. Prall implicitly contracted to waive any right to rely upon any representations of INB by the terms of the release agreement. He also expressly stated he was not relying upon the representations of INB in entering into the release. Prall further contractually agreed the release was given with full knowledge of all relevant facts. He represented,

---

**1.** The facts and circumstances before us in the instant case are unlike the facts in *Criterion Group.* In *Criterion Group* the tenants were asked to sign general releases which relieved their landlord and his agents from liability for any personal injury and property losses before they were allowed to inspect their fire damaged apartments. After signing the releases, they entered their apartments and found all their belongings gone. They then filed suit and, in an attempt to void the releases, alleged they were obtained by fraudulent misrepresentation and

were signed under economic duress. We found the trial court erred in granting summary judgment in favor of the defendants because there were genuine issues of material fact as to the validity of the general releases. The tenants were unrepresented by counsel at the time they signed the releases and in a subordinate position to the landlord. Thus, the issues of whether the landowners made the misrepresentation to induce the others to execute the releases and whether the latter relied on the alleged misrepresentation were questions of fact.

in effect, as a general partner of Wicks Partners, he had investigated the information concerning the disbursements to Stenz and Lowe. The knowledge was available to Prall at the time he signed the release. The disbursements had been made at the request of Wicks Partners, and as a general partner in that organization, Prall had both the practical and legal access to its books and records.

Even if Prall had not unequivocally affirmed in the release he was not relying on any representations from INB, he has failed to establish reliance. A releasor, in order to avoid a release on the ground of fraud or misrepresentation, must show he had a right to rely on the misrepresentation, and he did in fact rely on it in executing the release. E.G. *Id.;* 76 C.J.S. *Release* § 27 (1938). In other words, the fraud must have induced or produced the execution of the release or contributed to it as a cause. 76 C.J.S. at § 27. Additionally, it must appear the representation was made with the intent that it should be acted on by the releasor in the execution of the release. *Id.* Whether one has the right to rely depends largely on the facts of the case. *Neff v. Indiana State Univ. Bd. of Tr.* (1989), Ind.App., 538 N.E.2d 255, 258.

Prall has presented no evidence or argument to show INB's alleged misrepresentations about the disbursements induced him to sign the release or contributed to it as a cause. Nor did he present evidence to show the alleged misrepresentations were made with the intent to induce his execution of the release. Also, in executing the release Prall was an adverse party dealing at arms length with INB. At all times, he was represented by counsel who advised him. Neither party was in a dominate or subordinate position, one prerequisite to the right of reliance. To justify the repose of trust and confidence by one party in another, there must be a dominant and subordinate party. As a matter of law, no such relationship arises when the parties deal at arm's length. *Pugh,* 531 N.E.2d at 1198.

Furthermore, a party wishing to avoid the effect of his release must restore the status quo by restoring or tendering the consideration received by him. Full restoration of the consideration received for a release is a condition precedent to the maintenance of an action for the rescission of a contract or the avoidance of the bar raised by the pleading of the release. *Lazarrus v. Employers Mutual Casualty* (1977), 173 Ind. App. 452, 364 N.E.2d 140, 142; *Monnier v. Central Greyhound Lines* (1955), 125 Ind. App. 672, 129 N.E.2d 800, 803; 76 C.J.S. *Release* § 37 (1938). A party cannot rescind a contract, either for mistake or fraud, unless he affirms it or avoids it as a whole. *Monnier,* 129 N.E.2d at 895–06. Without this rule an unscrupulous releasor would be under no duty to restore the consideration he received and, being subject only to the possibility of having it set off against any judgment he might recover, could use the very money he received in compromise to prosecute subsequent action and, if unsuccessful therein, force the releasee to further protracted and expensive legal action for the attempted recovery thereof. *Id.*

Here, INB released Prall from the obligation of repaying the loan. At no time did Prall offer or attempt to offer to restore that consideration. Prall's failure to disaffirm *in toto* and restore the consideration he received for the release constituted an omission to perform the condition precedent to his right to prosecute this action as a matter of law.

In conclusion, we find the trial court did not err in finding Prall's claims barred as a matter of law by the mutual release.

Affirmed.

CHEZEM and HOFFMAN, JJ., concur.