**COUNTY LINE TOWING, INC. d/b/a County Line Garage, a/k/a County Line Pantry and Towing, Inc. and County Line Pantry, Inc., Appellants–Defendants,**

v.

**The CINCINNATI INSURANCE COMPANY, Appellee–Plaintiff.**

No. 35A02–9811–CV–938.

Court of Appeals of Indiana.

July 22, 1999.

Leonard E. Eilbacher, Eilbacher Scott, P.C., Fort Wayne, Indiana, Attorney for Appellant.

Mark D. Ulmschneider, Steele, Ulmschneider & Malloy, Fort Wayne, Indiana, Attorney for Appellee.

## OPINION

MATTINGLY, Judge

County Line Towing, Inc. (County Line) and its principal, Dale Higdon, appeal a summary judgment in favor of The Cincinnati Insurance Company (Cincinnati). County Line raises four issues, which we restate as:

1. Whether a settlement agreement between an insurer and an insured which purports to bar any claim made by the insured arising out of a particular incident prohibits the insured from bringing an action for the insurer's breach of its duty of good faith and fair dealing in its adjusting activities;

2. Whether a settlement agreement between an insurer and an insured which purports to bar any claim made by the insured arising out of a particular incident prohibits the insured from bringing an action for losses which might be covered under a separate policy not mentioned in the agreement;

3. Whether an insured must restore all payments it received in settlement of its insurance claim before it may bring an action

against the insurer for the insurer's breach of its duty of good faith and fair dealing in its adjusting activities or to recover funds due under the provisions of a separate insurance policy; and

4. Whether the sole shareholder and chief executive officer of a corporate insured may personally state a claim for tort damages arising from an insurer's breach of its duty of good faith and fair dealing when he is not named as an insured on any policy but when he alleges he was forced into bankruptcy by the insurer's actions.

We affirm in part, reverse in part, and remand.

## FACTS AND PROCEDURAL HISTORY

The facts most favorable to County Line, the non-moving party, are that on November 7, 1996, a fire damaged a convenience store owned by County Line. Higdon is sole shareholder and chief executive officer of County Line, which also operated a gasoline service station and towing/mechanic business at the same location. The fire damage to the convenience store effectively shut down the store. It also left the gasoline sales and towing/mechanic businesses without telephone, credit card, and cash register services and without heat, electricity, and restrooms, as those services and facilities were integrated with those of the convenience store.

The businesses County Line operated were insured by two Cincinnati policies, each with its own policy number. The convenience store and gasoline sales businesses were insured by a commercial property coverage policy (the "store policy") issued to County Line Pantry, Inc. The towing/mechanic business was covered by a garage policy (the "garage policy") issued to County Line Pantry and Towing, Inc.[1]

After the fire, Cincinnati adjusted the fire loss and paid claims under the store policy. It made no payment under the garage policy. Cincinnati failed to provide County Line with a temporary mobile office which County Line had requested in order to provide utilities, cashier and telephone services, and rest rooms so it could continue the operation of the towing/mechanic business. County Line asserts the "extra expense" coverage in either the store policy or the garage policy should have paid for the temporary office. Because it was denied a temporary office, County Line asserts its towing/mechanic business had to remain closed[2] until the store could be rebuilt.

County Line also asserts Cincinnati unnecessarily delayed settling the claims, forcing County Line to settle on Cincinnati's terms because County Line's fixed expenses continued and forcing Higdon to file for bankruptcy. Higdon signed, on August 13, 1997, as president of County Line Pantry, a Release of Claims and Receipt of Payment form (the "incident release"). The incident release provided that in exchange for the payment by Cincinnati of $217,424.50, County Line released Cincinnati from

all claims and causes of action of any type whatsoever which the undersigned has or may have against [Cincinnati] arising out of or in any way related to an incident which happened on or about the 6th day of November 1996 wherein fire damages occurred and payment made under [the store policy] and/or the adjustment of the claim presented to [Cincinnati] as a result of such incident.

The undersigned acknowledge that the amount of money referred to above has been received by them and understand that, by accepting the payment of said sum, the undersigned have been fully paid and compensated for all claims and causes of action which the undersigned could present against [Cincinnati] arising out of or in any way related to said incident.

R. at 64.

On June 3, 1998, Cincinnati brought an action requesting a declaratory judgment that it had no further obligations to County Line under the store policy and that County Line was not entitled to any benefits under

---

1. The business entity that owned all of the operations was named County Line Towing, Inc. It was incorporated in 1992, before the policies were issued.

2. Higdon was able to conduct some towing business out of his home.

the garage policy for losses arising out of the fire. County Line counterclaimed for compensatory and punitive damages, alleging breach of contract and fraud on the part of Cincinnati. In the counterclaim, Higdon asked leave to intervene, which the trial court apparently granted.[3] In its reply to Cincinnati's answer to the County Line counterclaim, County Line alleged the release was procured by fraud and/or misrepresentation, and that Cincinnati breached its duty of good faith and fair dealing.

On August 14, 1998, Cincinnati moved for summary judgment on grounds that County Line's breach of contract and fraud counterclaims are barred by the settlement and that the settlement cannot be attacked because County Line had not refunded to Cincinnati the money County Line received from the settlement. The trial court granted summary judgment, holding that "a party, having settled their [sic] claims, having received money, and having executed a release, cannot challenge that release and seek either additional contractual or tort remedies without first restoring the consideration received in the earlier settlement." *Id.* at 139–40. It further held that Higdon could not bring a contract or tort claim because he was not a party to the insurance contracts.

## STANDARD OF REVIEW

■ When reviewing a summary judgment, we apply the same standard applicable in the trial court. Summary judgment is proper only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). We do not weigh the evidence, but consider the facts in the light most favorable to the non-moving party. *Grose v. Bow Lanes, Inc.,* 661 N.E.2d 1220, 1224 (Ind.Ct.App.1996). We must reverse the grant of a summary judgment motion if the record discloses an incorrect application of the law to those facts. *Ayres v. Indian*

*Heights Volunteer Fire Dep't, Inc.,* 493 N.E.2d 1229, 1234 (Ind.1986).

■ On appeal from a grant of summary judgment, the burden is on the appellant to prove the trial court erred in determining there were no genuine issues of material fact and that the moving party was entitled to judgment as a matter of law. *Welch v. Scripto–Tokai Corp.,* 651 N.E.2d 810, 813 (Ind.Ct.App.1995). A fact is "material" for summary judgment purposes if it helps to prove or disprove an essential element of the plaintiff's cause of action. *Weida v. Dowden,* 664 N.E.2d 742, 747 (Ind.Ct.App.1996). A factual issue is "genuine" if the trier of fact is required to resolve an opposing party's different version of the underlying facts. *Id.*

## BRIEF OF APPELLEE

■ Before addressing County Line's allegations of error on appeal, we must note our concerns about the tone and content of the brief submitted by Cincinnati's counsel. Counsel's Statement of the Facts is rife with argument, which is inappropriate in that part of an appellate brief. *Barth v. Barth,* 693 N.E.2d 954, 956 (Ind.Ct.App.1998), *trans. denied.* A Statement of the Facts should be a concise narrative of the facts stated in a light most favorable to the judgment and should not be argumentative. *Nehi Beverage Co., Inc. of Indianapolis v. Petri,* 537 N.E.2d 78, 82 (Ind.Ct.App.1989).

The Statement of the Facts Cincinnati's counsel offers us is, by contrast, a transparent attempt to discredit County Line's argument; it is clearly not intended to be a vehicle for informing this court. For example, counsel offers as "facts" such legal conclusions and argumentative statements[4] as: "Appellants discuss at great length their dissatisfaction [with various actions by Cincinnati]. Not only did [Cincinnati] not have a duty in those areas, the Appellants specifical-

---

3. Neither party offers a citation to the record in support of that grant. However, the trial court does state in its decision on summary judgment that "Dale Higdon, who has intervened in this action, was not a named insured and was not a party to the contracts of insurance...." R. at 140.

4. Cincinnati characterizes these assertions as "clarifications" it felt must be made due to "the unnecessarily argumentative nature of Appellants' statement...." Brief of Appellee Cincinnati Insurance Company at 2.

ly released [Cincinnati]," Brief of Appellee Cincinnati Insurance Company at 2; "The entire reference [in County Line's Statement of the Facts to Higdon's bankruptcy] are (sic) absolutely irrelevant," *id.;* and "The release ... bars all claims of all types for that incident against [Cincinnati]," *id.* at 3.

■ The argument section of Cincinnati's brief is marred by a similar tone, as demonstrated by such statements as: "It is obvious that the Appellants do not want the Court of Appeals to truly appreciate the nature of the contractual bar ...," *id.* at 4; "[S]uch an esoteric discussion [about the severability of the obligations under the two policies] amounts to nothing more than an attempt to divert the Court's attention away from [the terms of the release]," *id.* at 6; "Taking ... [Cincinnati's] money is bad enough, but ... attempting to make an end run around the 'incident release' is quite troublesome," *id.;* "Upon close examination of Appellants' Brief, we find that buried deep within the legal argument section ... is the heart of the legal issue involved in this appeal," *id.* at 10; "Rather than analyze [the authorities Cincinnati cited to the trial court], the Appellants misrepresented what the Indiana Legal (sic) Encyclopedia stated. The Appellants then used the misstated law as a springboard to invite the trial court to follow uncited law ...," *id.* at 11 (citations to record omitted); "Appellants have resorted to the chain cite as the preferred method for ignoring all of the controlling legal precedent," *id.;* and "The Appellants are not interested in a level playing field. Rather, the Appellants want the Court of Appeals to permit them to play the 'heads I win, tails you lose' game," *id.* at 29.

■ We direct the attention of Cincinnati's counsel[5] to our statement in *Amax Coal Co. v. Adams,* 597 N.E.2d 350, 352 (Ind.Ct.App.1992):

> We must first discuss the quality of briefing by counsel in this appeal. Throughout the parties' briefs, they have launched rhetorical broadsides at each other which have nothing to do with the issues in this appeal. Counsels' comments concern their opposite numbers' intellectual skills, motivations, and supposed violations of the rules of common courtesy. Because similar irrelevant discourse is appearing with ever-increasing frequency in appellate briefs, we find it necessary to discuss the easily-answered question of whether haranguing condemnations of opposing counsel for supposed slights and off-record conduct unrelated to the issues at hand is appropriate fare for appellate briefs.

> At the outset, we point to the obvious: the judiciary, in fact and of necessity, has absolutely no interest in internecine battles over social etiquette or the unprofessional personality clashes which frequently occur among opposing counsel these days. Irrelevant commentary thereon during the course of judicial proceedings does nothing but waste valuable judicial time. On appeal, it generates a voluminous number of useless briefing pages which have nothing to do with the issues presented, as in this appeal.

> Further, appellate counsel should realize, such petulant grousing has a deleterious effect on the appropriate commentary in such a brief. Material of this nature is akin to static in a radio broadcast. It tends to blot out legitimate argument.

> On a darker note, if such commentary in appellate briefs is actually directed to opposing counsel for the purpose of sticking hyperbolic barbs into his or her opposing numbers' psyche, the offending practitioner is clearly violating the intent and purpose of the appellate rules. In sum, we condemn the practice, and firmly request the elimination of such surplusage from future appellate briefs.

A brief should not only present the issues to be decided on appeal, but it should be of material assistance to the court in deciding those issues. *Young v. Butts,* 685 N.E.2d 147, 151 (Ind.Ct.App.1997). A brief is far more helpful to this court, and it advocates far more effectively for the client, when its focus is on the case before the court and not

---

5. We commend counsel for County Line for his restraint in declining to respond in kind to Cincinnati's remarks in his reply brief.

on counsel's opponent. The "petulant grousing" and "hyperbolic barbs" which Cincinnati offers in its brief and which we condemned in our *Amax* decision do not suffice as the "cogent argument" our appellate rules have long been interpreted to require.[6] *See, e.g., Wright v. State,* 237 Ind. 593, 595, 147 N.E.2d 551, 552 (1958); *Byrd v. State,* 707 N.E.2d 308, 311 (Ind.Ct.App.1999).

## EFFECT OF THE INCIDENT RELEASE

Cincinnati notes that the incident release Higdon signed on behalf of County Line bars claims of all types against Cincinnati arising out of the fire: "The reason why the claims of the Appellants are barred is because the release says they are barred." Brief of Appellee Cincinnati Insurance Company at 4. Cincinnati supports this threshold argument with general authority such as *Indiana Bell Tel. Co., Inc. v. Mygrant,* 471 N.E.2d 660 (Ind.1984). There, an Indiana Bell truck collided with Mygrant's car and afterward, Indiana Bell and Mygrant executed a release which provided that Indiana Bell would pay Mygrant $600 in payment of all claims arising out of the accident. Some two months later, Mygrant became aware of injuries he had suffered in the accident and he sought to recover from Indiana Bell.

Mygrant argued he should be able to rescind the release and proceed against Indiana Bell because at the time he executed the release he was unaware of the extent of the injuries. Our supreme court noted that while mutual mistake could justify the rescission of a release, unilateral mistake could not. It held that any mistake was Mygrant's alone, and that Indiana Bell should have been granted a summary judgment. *Id.* at 663. It noted that "[p]arties involved in accidents engage in negotiations because of the incertitude as to the extent of injuries or liability, or both, and because of the uncertainty as to the outcome of any litigation which might ensue," *id.* at 664, and that general releases are not intended "merely to pay the releasor the first installment on what he should have, leaving the matter open for the releasor to

come back for more if his injuries prove serious." *Id., quoting Sanger v. Yellow Cab Co., Inc.,* 486 S.W.2d 477, 481–82 (Mo.1972).

We acknowledge this general rule but believe it does not support a summary judgment against County Line for two reasons. First, the existence of a release cannot bar a challenge to the release itself. Second, we believe there is a genuine issue of material fact as to whether the release under the store policy necessarily bars an action under the separate garage policy.

1. *A Release Cannot Bar an Action Alleging the Release Itself Was Obtained Fraudulently or in Bad Faith*

 An insurer has a duty to deal with its insured in good faith, and there is a cause of action for the tortious breach of that duty. *Erie Ins. Co. v. Hickman,* 622 N.E.2d 515, 519 (Ind.1993). The insurer's obligation of good faith and fair dealing includes an obligation to refrain from causing an unfounded delay in making payment; making an unfounded refusal to pay policy proceeds; exercising an unfair advantage to pressure an insured into settlement of his claim; and deceiving the insured. *Id.* As a result, an insured who believes an insurance claim has been wrongly denied may have available two distinct legal theories, one for breach of the insurance contract and one in tort for breach of the duty of good faith and fair dealing; the two theories have separate, though often overlapping, elements, defenses and recoveries. *Id.* at 520.

County Line alleged in its counterclaim that Cincinnati failed to offer certain adjustment activities and unreasonably delayed others while it instead devoted its efforts to implicating Higdon in causing the fire; that Cincinnati failed to explain to Higdon the full effect of the coverages he had; that Cincinnati failed to make a timely adjustment of certain covered losses when it knew Higdon was under severe financial pressure to pay current expenses; and that Cincinnati thus induced Higdon to accept less than the fair value of the damage coverage applicable to

---

**6.** Our statements in this regard are not intended to dissuade spirited and genuine disagreement between the parties as to the significance of

various facts or to the inferences which may be reasonably drawn; nor as to the proper interpretation and application of the law.

the pantry building and to forego his claim for the cost of a mobile office. County Line further alleged in its "Reply to Answer to Counterclaim and Affirmative Defenses" that the incident release had been "procured by fraud, misrepresentation and in breach of duty of good faith and fair dealing to defendants." R. at 104.

Thus, County Line's allegations that Cincinnati "induced [County Line] to accept less than fair value under the physical damage coverage applicable to the pantry building, and to forego [its] claim for the cost of a mobile office," *Id.* at 71, and of Cincinnati's "bad faith in the adjustment of the fire losses under the two insurance policies," *id.*, necessarily implicate the circumstances of the release itself. As the *Mygrant* court noted that the Indiana Bell release was "untainted by misrepresentation, fraud, overreaching, concealment, or persuasion on the part of the party released," 471 N.E.2d at 660, that decision cannot support Cincinnati's position that a release bars a subsequent tort action such as the one before us. In *Erie*, the insurer refused to pay the insured's claim upon grounds that its insured was more than 50% at fault. Accordingly, *Erie* does not address the question whether a settlement or release like the incident release before us would bar a subsequent tort action for fraud or for Cincinnati's breach of its duty of good faith and fair dealing.

Neither Cincinnati nor County Line refers us to any authority explicitly addressing whether an action for breach of the insurer's duty of good faith and fair dealing is barred by a settlement like that entered into by the parties before us, and our own research has revealed no such decisions. However, it is apparent that if, as *Erie* holds, the obligation of good faith and fair dealing means an insurer must refrain from using unfair advantage to pressure an insured into settling, then the

fact that the insurer has been successful in improperly obtaining a settlement could not, by itself, bar a claim for violation of that very obligation. *And see, e.g., Farm Bureau Mut. Ins. Co. of Ind. v. Seal,* 134 Ind.App. 269, 179 N.E.2d 760 (1962) (recognizing an action for fraud in procuring an insurance settlement). We thus decline to adopt Cincinnati's position that an action alleging a release was obtained in violation of the insurer's duty of good faith and fair dealing is necessarily barred by virtue of the fact the release was successfully obtained.

2. *A Release Obtained Under One Policy Does Not Necessarily Bar an Action Under a Separate Policy with a Different Named Insured*[7]

County Line argues that even if the release bars a challenge to Cincinnati's adjustment of the losses to the convenience store and its contents under the store policy, County Line may still challenge Cincinnati's failure to pay for a temporary office under the "extra expense" coverage in the store policy[8] and Cincinnati's failure to make any payments under the separate garage policy.

County Line first argues the extra expense provision of the store policy is severable from the rest of that policy, so that the settlement of the losses arising from the destruction of the store building and its contents does not bar an action for breach of the different and severable portion of the policy represented by the extra expense coverage and does not bar a bad faith claim based on failure to pay for losses under that coverage. County Line notes the general rule that when a contract is severable, the parts may be enforced separately, *e.g., Stoneburner v. Fletcher,* 408 N.E.2d 545 (Ind.Ct.App.1980). Without citation to any authority applying this general rule to provisions of insurance

---

7. County Line also argues the severability of the provisions within the store policy and the separate nature of the garage policy make inapplicable the general rule that an insured cannot make a further claim on a policy unless it restores to the insurer the funds paid in settlement of the claim. That argument will be discussed at more length in the following section of this opinion.

8. Cincinnati did pay $840 under the extra expense coverage, an amount County Line states in its brief that it "would gladly have restored in order to claim the much larger cost of a temporary office." Brief of Appellant at 23. It indicates it did not do so, however, because the trial court ruled County Line would have to return the full amount of its settlement, over $217,000, as a condition to County Line's assertion of a claim under the extra expense coverage. *Id.*

policies such as the ones before us, County Line argues that the store policy is a severable commercial property contract which assembles a variety of commercial coverage forms. Thus, County Line argues, the building coverage form should be seen as severable from the "extra expense" form and the settlement regarding the damage to the store building and contents should not bar an action for failure to provide "extra expense" coverage.

In *Armstrong v. Illinois Bankers Life Ass'n,* 217 Ind. 601, 29 N.E.2d 415 (1940), our supreme court construed a life insurance policy and the permanent disability provisions within it as severable contracts when additional premiums were paid for the disability benefits and the disability clause could be terminated at any time by the insured. The court noted that "[a] contract is not entire and indivisible because it is embraced in one instrument and executed by the same parties." *Id.* at 615, 29 N.E.2d at 420. The record does not reflect whether the extra expense provisions in the County Line policies involved an independent premium, whether they could be terminated by the insured at any time, or whether there were any other indicia of severability. There is a genuine issue of material fact with regard to whether the extra expense provisions are severable to such an extent that the release does not bar an action for coverage under those provisions. Thus, summary judgment for Cincinnati was improper.

■ County Line further notes it had a completely separate policy, the garage policy, and argues the settlement County Line and Cincinnati entered into with regard to the store and its contents under the provisions of the store policy should not bar County Line from bringing an action for breach of the separate garage policy for losses the towing/mechanic operation incurred as a consequence of damage to the facilities and services the store and the towing operation used in common.

The two insurance policies bear different policy numbers, were entered into on different dates, provide different coverages, and are issued to different named insureds.[9] The settlement was entered into between Cincinnati and Higdon as president of County Line Pantry, and it referred only to the policy number of the store policy. No proof of loss was submitted relating to the garage policy and no payments were made under that policy. Thus, County Line argues, the settlement under the store policy cannot bar a breach of contract action under the garage policy.[10]

■ The release does bar "all claims and causes of action of any type whatsoever which *the undersigned* has or may have" against Cincinnati; "the undersigned" is "Dale Higdon, President." R. at 64. Our decisions construing the broad language in similar releases indicate a release, like any other contract, should be interpreted according to the standard rules of contract law, with the intent of the parties regarding the purpose of the document to govern the construction. *See, e.g., Arnold v. Burton,* 651 N.E.2d 1202, 1204 (Ind.Ct.App.1995) (language which releases "all persons" does just that and is clear as long as no other terms are contradictory). We believe there is a genuine issue of material fact concerning whether the parties intended to treat the two parts of the County Line enterprise as two separate "insureds," only one of which would be bound by the release.

## EFFECT OF FAILURE TO RESTORE CONSIDERATION

■ County Line had not restored the settlement proceeds to Cincinnati when it

---

9. The store policy is issued to "County Line Pantry, Inc.," and the garage policy is issued to "County Line Pantry and Towing, Inc." In its brief, County Line refers to both of these as "non-existing entit[ies]," Brief of Appellant at 5–6, and states both operations were owned by a single corporation, County Line Towing, Inc. It argues the fact the policies had different named insureds evidences Cincinnati's belief that the policies were separate.

10. County Line provides no legal authority in this section of its brief. Except to the extent it argues the release bars *any* subsequent action (see discussion below), neither does Cincinnati's brief include any legal authority in support of its argument that the release does bar an action under the separate garage policy. However, Cincinnati invites us to find that County Line's argument is waived for failure to provide legal authority.

brought its counterclaim. As a result, the trial court's summary judgment was phrased in terms of whether any of County Line's or Higdon's counterclaims could be brought without County Line first restoring the consideration it had received from the settlement. The trial court found that "a party having settled their [sic] claims, having received money, and having executed a release, cannot challenge that release and seek either additional contractual or tort remedies without first restoring the consideration...." R. at 139–40.

County Line argues it need not restore the consideration it received from the settlement before bringing its counterclaims for two reasons. First, it argues the rule requiring restoration of consideration applies only when the claimant is seeking to rescind the agreement; thus, the rule does not apply to a tort action for damages arising from the insurer's breach of its duty of good faith and fair dealing or from the insurer's failure to provide additional benefits under a different policy provision. Second, as discussed above, County Line contends that to the extent the provisions of the store policy are severable from each other and the garage policy is itself separate from the store policy, County Line should not be required to restore the consideration from the settlement under that part of the store policy which covered damage to the store building and its contents as a condition precedent to a counterclaim for extra expenses under either the store policy or the garage policy.

Cincinnati relies on decisions such as *Monnier v. Central Greyhound Lines, Inc.*, 125 Ind.App. 672, 129 N.E.2d 800 (1955) which apply the general rule relied upon by the trial court to situations where a settlement was alleged to be improperly obtained. In *Monnier*, we did state that when an injured bus passenger sought to *disaffirm and avoid* a release she had signed on grounds she was of unsound mind and under duress, she was required to first restore everything she had received in consideration for the release. *Id.* at 676–77, 129 N.E.2d at 803.

However, an insured seeking further relief subsequent to a settlement need not in every situation disaffirm the release and restore the consideration. For example, our courts have long recognized that an insured alleging fraudulent procurement of a release of a claim has two choices: one, to return what he has received and bring suit on the original cause, or two, to keep what he has received and seek such a further amount as would make the settlement an honest one. *E.g., Farm Bureau,* 134 Ind.App. at 277, 179 N.E.2d at 763.

Summary judgment for Cincinnati based upon County Line's failure to restore the proceeds from the settlement was improper to the extent the trial court's judgment presumes County Line was seeking to avoid or disaffirm the release. In fact, it appears a challenge to Cincinnati's payment for the value of the building[11] reflected in the release is not the basis of County Line's fraud or bad faith claims; rather, the basis is Cincinnati's failure to provide certain "extra expense" coverage and other actions Cincinnati took in connection with the adjustment of the claim. To the extent that County Line is seeking "such a further amount as would make the settlement an honest one," and not to disaffirm and avoid the release, the summary judgment premised upon County Line's failure to return the proceeds of the settlement was improper.

## INDIVIDUAL CLAIM BY HIGDON

The trial court found that, because Higdon was not a party to the insurance contracts, "he has no right to maintain an action in contract or in tort based upon those claims," R. at 140, and that Higdon's attempt "to recover for bad faith or punitive damages is barred by the principle of law that one may not recover these types of damages

---

11. The release itself does not explicitly indicate that the settlement amount of $217,424.50 represents only payment for losses to the building and the pantry business. However, a "Summary of Checks Issued" which Cincinnati provided to County Line indicates all of the payments of the $217,174.50 included on that summary (except for $840 allocated to "Ext. Exp." and $550 allocated to "Fire Dep.") appear to be devoted to damage to the building and its contents and to interruption of the pantry business. *See* R. at 127.

when there is no right to recover compensatory damages." *Id.* at 141.

Higdon concedes he is not a party to the contracts but argues he may personally maintain a tort action for Cincinnati's bad faith and for infliction of emotional distress as a result of his bankruptcy because 1) he was County Line's *alter ego* by virtue of being its sole shareholder and chief executive officer, and 2) he was the County Line representative with whom Cincinnati dealt in the claims adjusting process.

 Higdon correctly notes that the legal fiction of a separate corporate identity is an equitable doctrine which will be disregarded to the extent the distinction between the corporation and the individual no longer exists. *See, e.g., Winkler v. V.G. Reed & Sons, Inc.,* 638 N.E.2d 1228, 1232 (Ind.1994). However, this general rule is limited in its application to situations where the corporate form is unfairly used to prevent a party from recovering from the corporate shareholders personally: "Under certain circumstances where necessary to prevent fraud or injustice on innocent third parties, the fiction of a distinct corporate existence may be disregarded and *the corporation held liable for the acts of its shareholders, officers and directors.*" *Iemma v. Adventure RV Rentals, Inc.,* 632 N.E.2d 1178, 1183 (Ind.Ct.App. 1994) (emphasis supplied). *And see Benson v. Warble,* 146 Ind.App. 307, 311–12, 255 N.E.2d 230, 233 (1970) (individual who creates a corporation as a means of carrying out his business purposes may not ignore the existence of the corporation in order to avoid its disadvantages).

We cannot say the trial court incorrectly applied the law to the facts before it when it determined that Higdon could not personally maintain an action against Cincinnati on the grounds he was not a named insured or a party to the insurance contracts.

## CONCLUSION

Higdon cannot bring an individual action against Cincinnati with regard to a contract to which his corporation, but not Higdon, was a party. However, the summary judgment against County Line was improper because 1) the action by the County Line corporate entity was not barred by County Line's failure to restore the proceeds of its settlement with Cincinnati; 2) the existence of a settlement does not bar County Line's action alleging fraud and bad faith in obtaining the settlement; and 3) there is a genuine issue of material fact regarding the severability of the policy provisions and the intent of the parties to the insurance agreement that the party insured under the garage policy would be bound by the release obtained under the store policy.

Affirmed in part, reversed in part, and remanded.

SULLIVAN and RILEY, JJ., concur.