**MORTGAGE CREDIT SERVICES, INC., Appellant–Plaintiff,**

v.

**EQUIFAX CREDIT INFORMATION SERVICES, INC., Appellee–Defendant.**

No. 49A02–0105–CV–345.

Court of Appeals of Indiana.

April 30, 2002.

David E. Wright, Ronald G. Sentman, Leagre, Chandler & Millard, Indianapolis, IN, Ernest E. Vargo, John M. Heffernan, Baker & Hostetler, LLP, Cleveland, OH, for Appellant.

James W. Riley, Jr., Riley Bennett & Egloff, LLP, Indianapolis, IN, Cindy D. Hanson, C. Allen Garrett, Jr., Kilpatrick Stockton, LLP, Atlanta, GA, for Appellee.

## OPINION

MATTINGLY–MAY, Judge.

Mortgage Credit Services, Inc. ("MCS") appeals a grant of summary judgment for Equifax Credit Information Services, Inc. and the denial of its own motion for summary judgment. MCS raises three issues on appeal, which we consolidate and restate as whether Equifax breached its contract with MCS by terminating their agreement despite a 1998 pricing agreement that obliged Equifax to maintain its prices for a three-year period.

We affirm.

## FACTS

MCS purchases credit information from national credit bureaus and resells it to commercial customers. On October 9, 1989, MCS and Equifax's predecessor, Credit Bureau Services, entered into a contract whereby Credit Bureau Services would provide credit information to MCS in exchange for a monthly fee and a payment per credit report. Equifax pur-chased Credit Bureau Services in 1998 and does not dispute that the purchase bound it to the terms of the 1989 contract.

The contract includes a provision printed in bold face and italicized type that states:

*IT IS MUTUALLY AGREED that this agreement shall remain in force and effect for one year and thereafter, from year to year, on the same basis as set forth herein until written notice of cancellation shall be given by either party at least 10 days prior to the end of the current monthly payment period.*

(App. at 63) (emphasis in original). The parties periodically negotiated agreements for the price of the credit reporting services. Under a January 1997 pricing schedule, MCS would pay $1.60 for most individual credit files and $2.10 for most joint credit files. Under the January 1998 pricing schedule, the price was lowered to $1.25 for certain individual files and to $1.85 for certain joint files. Both the 1997 and 1998 schedules included language to the effect that Equifax's predecessor would hold the prices constant for three years.

On February 9, 2000, Equifax sent a "Notice of Cancellation" to MCS notifying MCS that Equifax would cancel the parties' contract effective February 21, 2000.[1]

---

1. MCS asserts in its brief that "[a]ccording to the trial court's decision ... Equifax never terminated its supply relationship with MCS...." (Appellant's Br. at 4.) That characterization of the decision below is misleading at best. The trial court did note that Equifax and MCS continue to do business with each other under another contract. However, the trial court's order explicitly states Equifax sent a letter to MCS "enumerated as a 'Notice of Cancellation,' notifying the Plaintiff that the Defendant was serving written notice of cancellation of the contract effective February 21, 2000." (App. at 7.) The letter to which the trial court refers is included in the record and states in part "[Equifax] hereby terminates said Service Contract in accordance with its terms." The letter then quotes the termination provision. (App. at 177.) Still, MCS continues to assert "it is uncontroverted that Equifax never terminated MCS as a re-

## DISCUSSION AND DECISION

### Standard of Review

 This court stands in the shoes of the trial court when it reviews the grant or denial of a summary judgment motion. *Long v. Dilling Mechanical Contractors, Inc.*, 705 N.E.2d 1022, 1024 (Ind.Ct.App. 1999). When the designated materials show that there is no genuine factual issue and that the movant is entitled to judgment as a matter of law, the grant of a summary judgment motion will be affirmed. *Id.* We construe the evidence in the nonmovant's favor, resolving doubts about the existence of a genuine factual issue against the motion's proponent. *Id.* A grant of summary judgment may be affirmed on any theory that the designated materials support. *Id.* Generally, construction of a written contract is a question of law for which summary judgment is particularly appropriate. *Indiana Dept. Of Transp. v. Shelly & Sands, Inc.*, 756 N.E.2d 1063, 1069 (Ind.Ct.App.2001).

### Effect of Contract Termination

 To the extent MCS acknowledges that Equifax terminated the contract, it appears to argue the termination was improper because it "essentially allows Equifax to abrogate, at its sole discretion, any 'schedule of charges' it ever issued under the 1989 Service Agreement merely by threatening termination of the entire relationship under a clause found elsewhere in the same agreement." (Appellant's Br. at 11.) Such termination, MCS asserts,

would permit Equifax to "undermine rational expectations through 'gotcha' contract distortions." *Id.* at 13.

We decline to characterize an unambiguous termination provision to which both parties to a contract have agreed as "a 'gotcha' contract distortion" and believe the trial court correctly found the termination proper. We addressed a similar termination provision in *Barbasol Co. v. Leggett*, 106 Ind.App. 290, 19 N.E.2d 481 (1939). There, Leggett discovered a formula for a cleansing cream and contracted with Barbasol to manufacture and sell it. The contract provided that Barbasol would pay Leggett a monthly amount for as long as there was a profitable market for the product. When Barbasol determined the product could no longer be sold at a profit, it could discontinue the sale of the product, stop the monthly payments, and it would have no further liability under the agreement. Barbasol canceled the contract and Leggett sued for breach.

We noted our duty to construe an unambiguous provision of the contract in such a manner as to be consistent with the language employed and in such a manner as to show the true intention of the parties as gathered from the whole instrument. *Id.* at 296, 19 N.E.2d at 483. We further noted that we were required to accept a construction of a contract that harmonizes the provisions if that can reasonably be done, as against a construction that causes the provisions to be conflicting. *Id.* at 296, 19 N.E.2d at 483–84.

---

seller of credit information." (Appellant's Br. at 14.)

MCS does not mention in its Statement of the Facts the termination letter, or even acknowledge there that the contract included the termination provision. We remind counsel for MCS that the Statement of Facts in a brief must "describe the facts relevant to the issues presented for review." Ind. Appellate Rule 46(A)(6). We note that the Statement of

the Facts MCS offers also includes argument, which is inappropriate in that part of a brief. *See County Line Towing, Inc. v. Cincinnati Ins. Co.*, 714 N.E.2d 285, 289 (Ind.Ct.App. 1999), *transfer denied* 735 N.E.2d 219 (Ind. 2000) (Statement of the Facts should be a concise narrative of the facts stated in a light most favorable to the judgment and should not be argumentative.)

The trial court there had instructed the jury that "the part of the aforesaid contract only provides for a discontinuance of the manufacture and sale, and not for a cancellation and ending of all the rights and interest of the Plaintiff in said cleansing cream under said contract[.]" *Id.* at 295, 19 N.E.2d at 483. We determined that instruction was error: "We are at a loss to understand how a contract which gives a manufacturer the right to entirely discontinue the manufacture and sale of a product and when such a right is exercised relieves him from further liability, can be so interpreted as to leave pending further obligations." *Id.* at 297, 19 N.E.2d at 484. We went on to note that "[t]his contract gave the appellant the right to absolutely and entirely discontinue the manufacture and sale of this cleansing cream if they found the business unprofitable. When they so determined, the appellee was left without any further rights in this contract. All liability to her under the contract was terminated." *Id.* at 301–02, 19 N.E.2d at 486.

The *Barbasol* holding requires the same result in the case before us. The construction of the MCS contract that best harmonizes all of its provisions is one that recognizes the pricing provisions as determining the price of the credit reports during the duration of the service contract— that is, what the credit reports would cost if the contract was not terminated during the pricing schedule time period. The written notice of cancellation Equifax provided to MCS terminated all of the provisions of its contract with MCS, including the pricing terms implemented through the pricing schedules, and after the date of termination neither party owed any further duties or obligations to the other. Summary judgment for Equifax was therefore proper, and we affirm.

Affirmed.

BAKER, J., and NAJAM, J., concur.