**PUGH'S IGA, INC., Jack B. Pugh, Ruth E. Pugh, and Jack C. Pugh, Appellants (Third Party Plaintiffs Below),**

v.

**SUPER FOOD SERVICES, INC., Appellee (Third Party Defendant Below).**

No. 43A04–8801–CV–19.

Court of Appeals of Indiana, Fourth District.

Dec. 20, 1988.
Rehearing Denied Jan. 23, 1989.

Howard S. Grimm, Jr., Grimm, Haecker & Nimmo, Fort Wayne, for appellants.

R. Michael Parker, J. Scott Troeger, Barnes & Thornburg, Elkhart, David F. Hamilton, Barnes & Thornburg, Indianapolis, for appellee.

CONOVER, Presiding Judge.

Plaintiffs–Appellants Pugh's IGA, Inc., Jack B. Pugh, Ruth E. Pugh and Jack C. Pugh, (Pughs) appeal the entry of summary judgment in favor of Defendant–Appellee Super Food Services, Inc. (Super Foods) in a case seeking damages for fraudulent misrepresentations contained in a market survey analysis.

We affirm.

This appeal presents the following issues:

1. whether a market analysis furnished by Super Foods to the Pughs contained false representations of past or presently existing facts upon which the Pughs could place reasonable reliance,

2. whether such reliance was justified when Super Foods furnished further information the proposed supermarket could not succeed financially even if the estimated future sales contained in the market analysis were achieved,

3. whether the Pughs were guilty of contributory negligence as a matter of law in building the supermarket, and

4. whether the market analysis was the proximate cause of the store's subsequent financial failure.

Jack B. and Ruth E. Pugh for six years prior to April, 1983, owned Pugh's Quality Meats and Locker, a meat locker in La-Grange, Indiana. Jack had at least 25 years experience in the retail grocery and meat business prior to April, 1983. In the early 1980's the Pughs began investigating the feasibility of opening a supermarket either in LaGrange or in Albion, Indiana, the Pughs' hometown. Pursuing that interest, they visited Egolf's IGA in Churubusco to view the physical plant and the operation of the supermarket in late 1982 or early 1983. After that visit, at the Pughs' request, Jack Waltke of Super Foods visited the Pughs. He discussed with them the contribution Super Foods could make as the Pughs were considering whether to build their proposed supermarket.

Thereafter the Pughs met with Robert Mattfeld and Waltke several times. Mattfeld was in Super Foods' store development area. He conducted market analyses to determine the financial potential of proposed supermarkets.

After floor plans and incidental matters regarding such a store had been discussed, Super Foods did a market analysis of Albion to determine whether an additional supermarket there would be economically feasible. When completed, the market analysis showed among other things the site the Pughs had chosen south of Albion had a potential sales volume of $46,649 per week year round, with an additional sales volume of $2,538 per week during the period from April through September of each year due to an annual influx of summer residents.

In addition, Super Foods provided the Pughs with a "break even" analysis for the proposed supermarket. This analysis took into account the expenses of the proposed business whereas the market analysis did not. It merely estimated the gross sales potential of the site in question without considering the effect of operating expenses. The break even analysis indicated the Pughs would have to achieve average weekly sales of $48,903 just to reach a financial break even point. Thus, Super Foods' projections revealed potential expenditures exceeded potential gross income by $2,254 per week for six months, and a net profit of $284 per week for the remainder of the year if the supermarket were built.

The Pughs successfully arranged financing to build their project with American State Bank by negotiating a construction loan guaranteed by the Small Business Administration (SBA). The application for the SBA loan guarantee contained a forecast of two year's earnings which projected gross receipts for the proposed supermarket to be from $4,500 to $14,000 per week higher than the amounts projected by Super Foods in its market analysis. The Pughs then built the project. Construction delays caused the contractor to miss the estimated completion date by several weeks.

The store ultimately failed. The price of the goods the Pughs attempted to sell was initially higher than the competition's, its rival dramatically improved the efficiency of its operation by improving its management practices and by staying open 24 hours a day, and the Pughs' license to sell package beer and wine initially was turned down by the Indiana Alcoholic Beverage Commission then became embroiled in administrative proceedings for more than 10 months. Pugh's IGA, Inc. closed its doors on September 8, 1984.

The bank filed suit to recover on its loan from Pughs family members and to foreclose on the store property. The Pughs counterclaimed against the bank, then filed a third party complaint against Super Foods. After discovery, the trial court sustained Super Foods' motion for summary judgment. This appeal results.

In reviewing a trial court's grant of summary judgment, we apply the same standard as in the trial court. Summary judgment is only proper where there is no genuine issue as to any material fact, no conflict

as to any material inferences which could reasonably be drawn from the facts, and the party moving for summary judgment is entitled to judgment as a matter of law. *Ayres v. Indian Heights Volunteer Fire Dept.* (1986), Ind., 493 N.E.2d 1229, 1234; *Joseph v. Calvary Baptist Church* (1986), Ind.App., 500 N.E.2d 250, 253. When ruling on motions for summary judgment, courts must consider as true the facts set forth in the non-moving party's affidavits and liberally construe the discovery in the non-moving party's favor. *Four Winns, Inc. v. Cincinnati Ins. Co.* (1984), Ind. App., 471 N.E.2d 1187, 1188. A grant of summary judgment must be reversed if the record discloses an unresolved issue of material fact or an incorrect application of the law to those facts. *Ayres,* 493 N.E.2d at 1234.

### I.

The Pughs first contend Super Foods was guilty of actual fraud by falsely representing in the market analysis if the proposed supermarket were built, the Pughs' first year gross income would be substantially greater than it actually proved to be. At that time Super Foods knew (a) the Pughs would rely on the market analysis, (b) the projected first year income figures were false, and (c) Super Foods knew or recklessly failed to discover their falsity, the Pughs claim. As a direct and proximate result they were damaged, the Pughs assert.

In the alternative, they contend Super Foods was guilty of constructive fraud because the relationship of the parties imposed a duty on Super Foods to prepare the market analysis in a "workmanlike manner", and it did not. Super Foods' written and oral representations as to the accuracy of the analysis and the need for a supermarket in Albion were deceptive and violated Super Foods duty to the Pughs, they claim. Further, they had a right to rely on those representations, they did so, and as a proximate result suffered damage, they allege. We disagree.

■ The elements of actual fraud are

1. a material misrepresentation of past or existing fact by the party to be charged which

2. was false,

3. was made with knowledge or in reckless ignorance of the falsity,

4. was relied upon by the complaining party, and

5. proximately caused the complaining party injury.
*First Nat'l. Bank of New Castle v. Acra* (1984), Ind.App., 462 N.E.2d 1345, 1348; *American Indep. Management Systems, Inc. v. McDaniel* (1982), Ind.App., 443 N.E. 2d 98, 100.

■ The elements of constructive fraud are

1. a duty owing by the party to be charged to the complaining party due to their relationship,

2. violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists,

3. reliance thereon by the complaining party,

4. injury to the complaining party as a proximate result thereof, and

5. the gaining of an advantage by the party to be charged at the expense of the complaining party.
*Sanders v. Townsend* (1987), Ind.App., 509 N.E.2d 860, 865; *Blaising v. Mills* (1978), 176 Ind.App. 141, 374 N.E.2d 1166; *Windle v. City of Valparaiso* (1916), 62 Ind.App. 342, 113 N.E. 429, 433–34. Unlike actual fraud, intent to deceive is not an element of constructive fraud. Rather, the law infers fraud from the relationship of the parties and the circumstances which surround them. *Sanders,* 509 N.E.2d at 865; *Coffey v. Wininger* (1973), 156 Ind.App. 233, 296 N.E.2d 154; *Windle, id.*

■ Though generally fact-sensitive on a case by case basis, several fundamental principles apply in actionable fraud cases as matters of law. Two of these principles apply here, namely,

1. the misrepresentation must have been as to past or existing facts, and

2. the complaining party must have had the right to rely upon those misrepresentations.

It is clear Super Foods did not misrepresent any past or existing facts in its market survey. The only current facts were contained in a collection of data concerning Albion and the surrounding area obtained from Editor and Publisher Market Guide, the 1980 Census of Population and Housing, the Noble County Planning Agency, and on-site factual observations made by Super Foods personnel. No misrepresentation of such facts is either alleged or relied upon by the Pughs. The market analysis's conclusion reads, in part, as follows:

> This report examines the trading area centered in Albion, in Noble County, Indiana.
>
> It has been determined that the trading area contains a year-round population of 5,995 people with this increasing to 6,569 during the period of April through September. This is a seasonal increase of 574 people. It does not include the vacationing or weekend people to the Chain O'Lakes State Park or other lakes in the area.
>
> *The year-round trade area population has supermarket dollar potential of $106,022.00. With a site factor of 44%, the site has sales potential of $46,649.00 per week.* This would compute to a store size of about 8,500 square feet of total store. *With the seasonal sales of $2,538.00 per week spread over the entire year, the average sales would be $47,723.00 per week for a store size of 8,677 square feet.*
>
> The unknown factor at this site is the amount of sales increases from the vacationing or weekend trade from the Chain O'Lakes and other lakes. This amount was not able to be concluded in this report.
>
> There is a need for a store in Albion. The existing Super Valu is allowing the major portion of the supermarket dollars to escape to the surrounding towns. (Emphasis supplied).

(R. 1376). That the store's gross income fell far short of that projection is the gravamen of the Pughs fraud complaint. However, as a matter of law, the Pughs in the first instance did not have a *right* to rely on Super Foods projection of future gross income.

Super Foods' projections were mere statements of opinion as to future profits rather than past or existing facts. Expressions of opinion are not actionable and the court should refuse to submit such statements to the jury. *Jenkins v. Long* (1862), 19 Ind. 28, 29; *Master Abrasives Corp. v. Williams* (1984), Ind.App., 469 N.E.2d 1196, 1201; *Plymale v. Upright* (1981), Ind.App., 419 N.E.2d 756, 760–61; *Wisconics Engineering, Inc. v. Fisher* (1984), Ind. App., 466 N.E.2d 745, 756.

Also, the Pughs were experienced business people who had full access to all the relevant facts at all times. Thus, the Pughs and Super Foods were doing business "at arm's length." *Wisconics*, 466 N.E.2d at 757. To justify the repose of trust and confidence by one party in another, there must be a dominant and subordinate party. As a matter of law, no such relationship arises when the parties deal at arm's length. *Vaughn v. General Foods Corp.* (C.A.7, 1986), 797 F.2d 1403, 1414; *Grow v. Indiana Retired Teachers Community* (1971), 149 Ind.App. 109, 271 N.E. 2d 140, 143–144.

Finally, the Pughs apparently relied solely upon Super Foods' projections of gross income and ignored its projections of net income which forecast a loss of approximately $2,254 per week for six months and a bare "break even" of $284 net profit per week for the remainder of the year. Our Supreme Court long ago stated:

> To constitute a misrepresentation a ground of fraud [sic] for avoiding the contract, or to entitle the injured party to his action, it must be in regard to a material fact, operating as an inducement to the purchase or the making of the contract, and upon which the purchaser or person making the contract had a clear *right* to rely; and the party complaining must have been actually de-

ceived thereby; and generally, *such representation must not be mere matter of opinion, or in respect of facts equally open to the observation of both parties,* and concerning which the party complaining, had he exercised ordinary prudence, could have attained correct knowledge. *If a party blindly trusts, where he should not, and closes his eyes, where ordinary diligence requires him to see, he is willingly deceived,* and the maxim applies *volenti non fit injuria* [He who consents cannot receive an injury]. (Emphasis supplied).

*Frenzel v. Miller* (1871), 37 Ind. 1, 17. Clearly, the Pughs had no right to rely upon the projections of gross income contained in Super Foods market analysis for those reasons. Because the required elements of misrepresentation of past or existing facts and a right in the complaining party to rely are absent, the Pughs attempt to present a case of actual or constructive fraud fails.

## II.

■ The Pughs next argue Super Foods negligently breached its contract with them to provide an accurate market survey by failing to perform in a workmanlike manner, citing *Wilson v. Palmer* (1983), Ind. App., 452 N.E.2d 426, and *Essex v. Ryan* (1983), Ind.App., 446 N.E.2d 368.[1] Super Foods negligence in failing to provide the Pughs with a substantially accurate projection of gross income proximately caused them damage, the Pughs assert. In confession and avoidance, Super Foods argues

(a) the Pughs were guilty of contributory negligence as a matter of law,[2] and

(b) such negligence was not the proximate cause of the Pughs' injury.

We agree the Pughs were guilty of contributory negligence as a matter of law.

Assuming without deciding Super Foods' failure to accurately project the proposed supermarket's gross income for its first year of operation constituted negligence, Super Foods' projection of profit and loss was substantially accurate. It predicted the project's total insolvency from the beginning, if the supermarket was ever built. Its profit and loss projections demonstrated a loss of more than $51,000 for the first year of the supermarket's operation. The Pughs' ignoring of Super Foods' projected loss of over $4,200 per month if the project were built constitutes contributory negligence as a matter of law.

■ Contributory negligence is defined as

the failure of a person to exercise for his own safety that degree of care and caution which an ordinarily reasonable and prudent person in a similar situation would exercise.

*Kroger Co. v. Haun* (1978), 177 Ind.App. 403, 408, 379 N.E.2d 1004, 1007. Whether one is guilty of contributory negligence is determined by application of the same objective standards as are employed in determining the negligence of a defendant. *Schneider v. Wilson* (1988), Ind.App., 521 N.E.2d 1341, 1343; *Cartwright v. Harris* (1980), Ind.App., 400 N.E.2d 1192. Contributory negligence of any degree is an absolute bar to a negligence claim. *Schneider, supra,* 521 N.E.2d at 1343; *Law v. Yukon Delta, Inc.* (1984), Ind.App., 458 N.E.2d 677, 680. While contributory negligence is generally a question of fact for the jury

---

1. The Pughs also make vague reference to a cause of action for negligent misrepresentation under *Restatement (Second) of Torts*, § 552, citing *Eby v. York–Division, Borg–Warner* (1983), Ind.App., 455 N.E.2d 623. However, the Pughs fail to support that citation with cogent argument and a clear showing of how that issue relates to the particular facts of this case. Thus, that issue is waived. *Matter of Kesler* (1979), 272 Ind. 161, 397 N.E.2d 574, *cert. den'd.* (1980), 449 U.S. 829, 101 S.Ct. 96, 66 L.Ed.2d 34; *Capt. & Co., Inc. v. Stenberg* (1987), Ind.App., 505 N.E.2d 88; *Briggs v. Clinton County Bank, etc.*

(1983), Ind.App., 452 N.E.2d 989; Indiana Rules of Procedure, Appellate Rule 8.3(A)(7). Further, *Eby* is limited to its own facts and is not applicable in this instance. Indiana does not recognize the tort of negligent misrepresentation. *Wilson, supra,* 452 N.E.2d 426; *Essex, supra,* 446 N.E.2d 368.

2. The Indiana Comparative Fault Act was not the law in 1983. It became effective January 1, 1985.

where the facts are subject to more than one reasonable inference, the question becomes one of law where the facts are undisputed and only a single inference reasonably can be drawn therefrom. *Hundt v. LaCrosse Grain Co., Inc.* (1983), Ind., 446 N.E.2d 327, 328–329; *Law, id.* The trial court correctly determined the Pughs were guilty of contributory negligence as a matter of law.

In view of the result reached in this opinion as to contributory negligence, we perceive no pressing need to discuss the issue of proximate cause.

AFFIRMED.

SHIELDS, P.J., concurs.

MILLER, J., concurs in result.