ATTORNEY FOR APPELLANTS
Christopher D. Wyant
Wyant Law Office, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
David Steiner
Deputy Attorneys General
Indianapolis, Indiana



FILED
Aug 24 2017, 10:08 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# In the
# Indiana Supreme Court

No. 49S02-1609-CT-464

JOHN DOE #1, *ET AL.*,

*Appellants (Plaintiffs),*

v.

INDIANA DEPARTMENT OF CHILD SERVICES,

*Appellee (Defendant).*

Appeal from the Marion Superior Court Civil Division 11, No. 49D11-1404-CT-11045
The Honorable John F. Hanley, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 49A02-1506-CT-682

**August 24, 2017**

**Rush, Chief Justice.**

The Indiana Department of Child Services told a child-abuse reporter that his report was confidential, but then released it without redacting his identity. The reporter and his family sued DCS based on both the statute protecting reporter anonymity and our common law. We denounce DCS's thoughtlessness, but find no basis for liability under either theory. The statute protecting anonymity provides no private right of action—and we will not judicially infer one since the statute's main purpose is to protect children in general and since it already provides enforcement

mechanisms. Likewise, DCS's recitation of the confidentiality statute did not create a common-law duty. We thus affirm summary judgment for DCS.

**Facts and Procedural History**

John Doe #1 lived with his wife, two adult sons, and minor daughter in a small southern-Indiana town where "[e]verybody knows everybody." Each Wednesday, John drove neighborhood children to church. Over time, he noticed that something wasn't quite right with some of his young passengers—eventually suspecting they were victims of abuse and neglect.

After talking it over with his wife, John called the DCS abuse and neglect hotline to report his suspicions. Near the end of the call, the DCS hotline employee asked for his contact information. Hesitant, John said he did not want anyone to know he called. But the operator explained, "Well, it's confidential. Nobody will find out." John gave his first name and phone number, then hung up.

A few days later, John was mowing the grass when an irate neighbor began screaming at him while waving the DCS report—which was unredacted. Word spread around town and the Does were soon labeled "snitches." John was "stared at, glared at, mooned, flipped off, [and] yelled at." His wife was threatened that someone might "cut that smirky grin off" her face. Their daughter required counseling because of bullying at school. And the Does' sons hesitated to go outside— thinking twice about cooking on the grill or taking out the trash. All this harassment shook the family, making them wish they could afford to leave their longtime home for a different city.

The Does sued DCS for negligently disclosing John's identity, raising two theories: one statutory, the other common-law. First, they claimed that the statute requiring DCS to protect reporter identity—Indiana Code section 31-33-18-2 ("Section 2")—implies a private right of action. Second, they asserted that the DCS hotline operator's statement that "[n]obody will find out" was a promise creating a common-law duty of confidentiality. DCS moved for summary judgment, asserting that Section 2 implies no right of action because it was designed to protect children by encouraging reporting, rather than to enable lawsuits, and that the common law imposes no duty on this record. The trial court granted summary judgment for DCS.

A divided panel of the Court of Appeals reversed. Doe v. Ind. Dep't of Child Servs., 53 N.E.3d 613 (Ind. Ct. App. 2016). The majority declined to address whether Section 2 implied a

right of action—finding instead that DCS owed the Does a common-law "private duty" based on the hotline worker's "promise" of confidentiality. Id. at 616–17 (citing Mullin v. Mun. City of S. Bend, 639 N.E.2d 278, 284–85 (Ind. 1994)). Chief Judge Vaidik dissented, believing that Section 2 implied no right of action because its thrust was encouraging reporting, not enabling lawsuits, and that the common-law claim failed as well because the private-duty test applied only to emergency-dispatch situations. Id. at 618–21 (Vaidik, C.J., dissenting).

We granted DCS's petition to transfer, thereby vacating the Court of Appeals decision. Ind. Appellate Rule 58(A).

## Standard of Review

We review summary judgment de novo, affirming only when the designated evidence reveals no genuine issue of material fact and entitles the moving party—here, DCS—to judgment as a matter of law. Ind. Trial Rule 56(C); Hughley v. State, 15 N.E.3d 1000, 1003 (Ind. 2014).

At issue are two legal questions that we also address de novo. First, does Section 2, which prohibits DCS from identifying reporters, create a private right of action? Howard Reg'l Health Sys. v. Gordon, 952 N.E.2d 182, 185 (Ind. 2011) (reviewing the existence of a private right of action as a matter of law). Second, if not, does the common law nevertheless impose an actionable duty on DCS for telling John that his report was "confidential"? Rogers v. Martin, 63 N.E.3d 316, 320 (Ind. 2016) (reviewing the existence of a common-law duty, absent genuine issues of material fact, as a matter of law).

## Discussion and Decision

To prevail on their negligence claims, the Does must prove that DCS (1) owed them a duty, (2) breached that duty, and (3) proximately caused their injuries. Rogers, 63 N.E.3d at 321. Here, the parties dispute only the first element: whether DCS owed a duty of confidentiality under Section 2 and, if not, whether it owed one under the common law. Though DCS's disclosure was irresponsible, it cannot trigger civil liability under either theory.

## I.     Section 2 Provides No Private Right of Action.

The parties agree that Section 2 does not expressly provide a private right of action; they dispute only whether it implies one. This is purely a question of legislative intent, not judicial preference: did the General Assembly intend Section 2 to create a right of action, despite not saying

3

so expressly? See Alexander v. Sandoval, 532 U.S. 275, 286–87 (2001). We have "long been reluctant" to infer this unwritten intent, since the legislature often[1] creates rights of action using clear language. See F.D. v. Ind. Dep't of Child Servs., 1 N.E.3d 131, 143–44 (Ind. 2013) (Rush, J., concurring in part and dissenting in part). This reluctance to invade the legislature's purview has developed into a two-part rule: we usually will not infer a private right of action when the statute (1) primarily protects the public at large and (2) contains an independent enforcement mechanism. See, e.g., Gordon, 952 N.E.2d at 187 (citing Estate of Cullop v. State, 821 N.E.2d 403 (Ind. Ct. App. 2005)); LTV Steel Co. v. Griffin, 730 N.E.2d 1251, 1260 (Ind. 2000). We address each part in turn.

### A. The statute's mission is to protect children, not reporters.

When a statute is designed mainly for public benefit, it implies no right of action; incidental benefits to a private party make no difference. See Sprunger v. Egli, 44 N.E.3d 690, 693–94 (Ind. Ct. App. 2015); C.T. v. Gammon, 928 N.E.2d 847, 853–54 (Ind. Ct. App. 2010); Whinery v. Roberson, 819 N.E.2d 465, 475 (Ind. Ct. App. 2004), trans. dismissed; Borne ex rel. Borne v. Nw. Allen Cty. Sch. Corp., 532 N.E.2d 1196, 1203 (Ind. Ct. App. 1989), trans. denied. In Borne, for example, a child-abuse victim sued an elementary-school principal for breaching his statutory duty to report abuse. 532 N.E.2d at 1202. Though that statutory duty would have undeniably benefited the particular child-abuse victim, the Court of Appeals refused to infer a private right of action since the statute's "primary thrust" was helping children in general. Id. at 1203.

---

[1] See, e.g., Ind. Code § 5-14-1.5-7 (Supp. 2016) (open door law); I.C. § 5-14-3-9 (Supp. 2016) (public records access); I.C. § 6-1.1-35-12 (2014) (disclosure of confidential tax information); I.C. § 9-22-3-36 (2016) (salvage motor vehicles); I.C. § 16-41-2-7 (2008) (reporting communicable diseases); I.C. § 23-2-5-15 (2016) (loan brokers); I.C. § 23-19-5-9 (2016) (securities fraud); I.C. § 24-3-2-12(b) (2016) (cigarette fair trade); I.C. § 24-3-4-14 (2016) (cigarette import and distribution); I.C. § 24-4-5-7 (2016) (cloth product trademarks); I.C. § 24-4.8-3-1 (2016) (spyware); I.C. § 24-5-8-17 (2016) (business opportunity transactions); I.C. § 24-5-13.5-13 (2016) (buyback vehicle disclosures); I.C. § 24-5-15-9 (2016) (credit services); I.C. § 24-5-17-14 (2016) (environmental marketing claims); I.C. § 24-5-19-9 (2016) (deceptive commercial solicitation); I.C. § 24-5-21-6 (2016) (prescription drug discount cards); I.C. § 24-5-23-2 (2016) (marketing by mortgage lenders); I.C. § 24-5-24-15 (2016) (security freezes for consumer reports); I.C. § 24-9-5-4 (2016) (home loan practices); I.C. § 24-11-5-1 (2016) (patent infringement); I.C. § 32-31-7-7 (2016) (tenant obligations); I.C. § 32-31-8-6 (2016) (landlord obligations); I.C. § 32-36-1-10 (2016) (rights of publicity); I.C. § 32-37-5-1 (2016) (copyright); I.C. § 34-28-7-3 (2014) (possessing firearms in locked vehicles); I.C. § 35-42-3.5-3 (2014) (human and sexual trafficking); I.C. § 36-7-11-21 (2012) (historic preservation).

The statute here has the same "primary thrust" as the statute in Borne. Indeed, they are both part of the "Reporting and Investigation of Child Abuse and Neglect" scheme, which declares five purposes all revolving around helping children in general:

> (1) encourage effective reporting of suspected or known incidents of child abuse or neglect;
> (2) provide effective child services to quickly investigate reports of child abuse or neglect;
> (3) provide protection for an abused or a neglected child from further abuse or neglect;
> (4) provide rehabilitative services for an abused or a neglected child and the child's parent, guardian, or custodian; and
> (5) establish a centralized statewide child abuse registry and an automated child protection system.

I.C. § 31-33-1-1 (2008).

This child-centered framework does not just encourage reporting; it consciously "err[s] on the side of *over* reporting." Smith v. State, 8 N.E.3d 668, 683, 692 (Ind. 2014) (affirming a high-school principal's conviction for failing to report a student's alleged rape). It does so using two main tools. First, it imposes criminal liability—a Class B misdemeanor—for anyone who has reason to believe that a child may be a victim of abuse or neglect but fails to immediately report it to DCS or to police. I.C. §§ 31-33-5-1, -4, -22-1(a) (2008). Second, it immunizes good-faith reporters from any civil or criminal liability that may arise from their reports. I.C. § 31-33-6-1, -2 (2008).

And this framework's confidentiality protections further facilitate the goal of "over reporting" to help identify abused or neglected children. After a report comes in, the statutes require DCS to act promptly while guarding the reporter's identity. Within 48 hours, DCS must write a confidential report that identifies the child, the alleged perpetrator, and the "source of the report." I.C. § 31-33-7-4 (2008); I.C. § 31-33-18-1(a) (Supp. 2012). DCS may disseminate this report to a closed universe of recipients—including police and prosecutors—but it must "protect[]" the reporter's identity when disseminating the report to the victim's parents and the accused. I.C. § 31-33-18-2 (Supp. 2012). This procedure ultimately serves the statutes' express purpose of protecting children. See I.C. § 31-33-1-1.

In sum, the objective of this statutory scheme is clear: helping and protecting Hoosier youth. Year after year, the number of Indiana's child abuse and neglect investigations and cases

continues to climb.[2] The General Assembly's mission—expressed in the statutory scheme's five purposes—is to reverse this trend through reporting. That one of the scheme's provisions incidentally benefits reporters by requiring confidentiality does not change this goal—especially given the alternative confidentiality-enforcement mechanisms we now address.

### B. The statutory scheme already provides enforcement.

When a statute expressly provides one enforcement mechanism, courts may not engraft another. See Gordon, 952 N.E.2d at 187 (citing Estate of Cullop, 821 N.E.2d 403). Affirming this principle, Indiana courts find no private right of action where the General Assembly has provided independent enforcement—even if only an infraction. See id.; Kimrey v. Donahue, 861 N.E.2d 379, 382 (Ind. Ct. App. 2007), trans. denied; Stulajter v. Harrah's Ind. Corp., 808 N.E.2d 746, 748 (Ind. Ct. App. 2004); Estate of Cullop, 821 N.E.2d at 409 (gleaning no right of action from a transportation statute as it already provided independent enforcement through a Class C infraction).

Here, Section 2 contains *two* alternative enforcement mechanisms. First, a public employee—including a DCS hotline worker—who "knowingly or intentionally discloses" confidential information commits a Class A infraction carrying a fine of up to $10,000. See I.C. § 5-14-3-10(a) (Supp. 2012); I.C. § 34-28-5-4(a) (Supp. 2012). Second, that employee may also be "disciplined in accordance with the personnel policies" of their agency. I.C. § 5-14-3-10(b). DCS's personnel policies provide that employees who breach confidentiality face a range of discipline, including dismissal.

We do not, of course, condone DCS's thoughtless fumbling of sensitive information. Quite the opposite. Child-abuse reporters are DCS's eyes and ears on the front lines of the fight to protect children—and without their trust and cooperation, DCS faces a nearly impossible uphill battle. Knowing this, our General Assembly might choose to impose a right of action, just as it has for Hoosiers falsely accused of child abuse. I.C. § 31-33-22-3(b) (Supp. 2012). But separation of powers requires us to leave that decision to the legislature, rather than make it ourselves under the guise of statutory interpretation.

---

[2] See, e.g., Ind. Dep't of Child Servs., Annual Report to the State Budget Committee & Legislative Council, at 23–24 (Dec. 2016), http://www.in.gov/dcs/files/SFY16DCSAnnualReportFINAL.pdf.

Thus, we cannot infer that the General Assembly intended Section 2 to impose civil liability. We now address the Does' common-law claim.

## II.     There Is No Common-Law Basis to Impose a Duty on DCS.

The Does do not assert that there is a general common-law duty to maintain confidentiality. Rather, they argue that DCS had a duty because John detrimentally relied on the DCS worker's statement that reporter identity is confidential. In addressing this common-law argument, we discuss three theories (though the Does directly raise only the first): the "private duty" doctrine, the assumed-duty doctrine, and the three-part test for new duties in Webb v. Jarvis, 575 N.E.2d 992 (Ind. 1991). For the reasons explained below, we hold that none of these theories creates a duty and thus reject the Does' common-law claim.

### A. The "private duty" test applies only to a government's promise to send emergency services.

In asserting their detrimental-reliance claim, the Does invoke the "private duty" test from Mullin v. Mun. City of S. Bend, 639 N.E.2d 278 (Ind. 1994), and Koher v. Dial, 653 N.E.2d 524 (Ind. Ct. App. 1995), trans. denied. In Mullin, after a mother lost her son to a house fire, she sued the city for breaching its "private duty" to dispatch an ambulance. 639 N.E.2d at 280. On appeal, we adopted a three-part private-duty test rooted in detrimental reliance: (1) the government must give "explicit assurance" that it will assist the plaintiff, (2) it must know that inaction could harm the plaintiff, and (3) the plaintiff must justifiably and detrimentally rely on the government's affirmative undertaking. Id. at 284 (citing City of Rome v. Jordan, 426 S.E.2d 861, 863 (Ga. 1993)). We held, however, that the mother's claim failed the test because the city never promised an ambulance and because she gave no evidence of detrimental reliance. Id. at 285. In other words, if there is no promise or no detrimental reliance, there can be no private duty.

Though broadly worded, Mullin's private-duty test was quickly confined to its original emergency-dispatch context. In Benton v. City of Oakland City, a man broke his neck diving into a lake and sued the city for breaching a duty to post shallow-water warnings. 721 N.E.2d 224, 225 (Ind. 1999). The Court of Appeals affirmed summary judgment for the city since it never assumed any "private duty." Id. at 226. On transfer, we agreed because the private-duty test applies only to situations like the one in Mullin—where a governmental unit is alleged to have breached a duty to provide "emergency services." Id. at 233.

Here, as in <u>Benton</u>, the Does' claim does not pertain to "emergency services" and thus falls short of the narrow private-duty test. Certainly, John relied on the hotline employee's statement that reporter identity was confidential. But since that statement was about confidentiality—not emergency dispatch—the Does cannot establish a private duty.

<u>Mullin</u>'s test, however, is not the only doctrine that encompasses detrimental-reliance claims. The Does also raised at the summary-judgment hearing the broader assumed-duty doctrine. We elect to address this issue.

### B. Assumed duty does not apply as DCS only paraphrased a statute.

Indiana common law recognizes that one may gratuitously assume a duty by conduct. <u>See, e.g.</u>, <u>Yost v. Wabash Coll.</u>, 3 N.E.3d 509, 516–18, 521 (Ind. 2014). But we impose these duties "cautiously," and have adopted the demanding test in the Restatement (Third) of Torts section 42, which requires a specific "undertaking":

> An actor who undertakes to render services to another and who knows or should know that the services will reduce the risk of physical harm to the other has a duty of reasonable care to the other in conducting the undertaking if:
>
> (a) the failure to exercise such care increases the risk of harm beyond that which existed without the undertaking, or
> (b) the person to whom the services are rendered or another relies on the actor's exercising reasonable care in the undertaking.

<u>See</u> <u>id.</u> at 517; <u>S. Shore Baseball, LLC v. DeJesus</u>, 11 N.E.3d 903, 910–11 (Ind. 2014) (citing <u>Yost</u> as adopting the Restatement's test). This "undertaking" element sets a high bar, requiring "affirmative, deliberate conduct." <u>Yost</u>, 3 N.E.3d at 517.[3]

Critical here, this high bar is not cleared when the defendant merely references some type of pre-existing rule—like a regulation, policy, or statute. <u>See</u> <u>id.</u> at 517–18. In <u>Yost</u>, for example,

---

[3] <u>See also</u> <u>Smith v. Delta Tau Delta, Inc.</u>, 9 N.E.3d 154, 161–63 (Ind. 2014) (finding fraternity's published rules against underage drinking insufficient to assume a duty to prevent it); <u>McCollough v. Noblesville Sch.</u>, 63 N.E.3d 334, 339, 346 (Ind. Ct. App. 2016) (finding school principal's promise to investigate a basketball coach's alleged battery insufficient to assume a duty to do so), <u>trans. denied</u>; <u>McClure v. Strother</u>, 570 N.E.2d 1319, 1321 (Ind. Ct. App. 1991) (finding landowner's promise that ground was firm insufficient to assume a duty to prevent plaintiff's ladder from slipping on mud).

a college freshman suffered an injury during a fraternity hazing event and sued the college, arguing that it had assumed a duty to protect him in part because it had disseminated an anti-hazing policy. Id. at 513, 517–18. But we disagreed, finding this "do[es] not rise to the level of a specific undertaking that demonstrate[s] a special relationship." Id. at 518. Communicating a rule was not enough.

Nor did merely communicating a rule pass muster in Lanni v. NCAA, 42 N.E.3d 542, 553 (Ind. Ct. App. 2015). There, a spectator at a college fencing match took a saber to the face and sued the NCAA, arguing that it had assumed a duty—by, among other things, setting boundaries around the fencing area—to prohibit spectators from standing too close to the action. Id. at 550, 553. But, relying on Yost, the Court of Appeals disagreed, reasoning that communicating a rule for bystanders' safety does not "rise to the level of assuring [bystanders'] protection." Id. at 553. In short, conveying existing rules without an accompanying specific undertaking does not trigger liability.[4]

And that is all the DCS hotline employee did here. By informing John that his report was confidential, the employee did no more than the college in Yost or the NCAA in Lanni—she simply communicated an existing rule. Granted, the employee did summarize Section 2 using her own words: "[I]t's confidential. Nobody will find out." But given the demanding standard for "specific undertaking," and given our caution in finding gratuitously assumed duties, we cannot read the hotline worker's words as an offer to take on additional common-law liability.

This holding aligns with our reluctance to infer private rights of action. That is, when a statute provides no right of action, the fact that a defendant repeats it aloud does not trigger independent liability. Indeed, Indiana and other jurisdictions disfavor such end-runs around the legislature. See Sprunger v. Egli, 44 N.E.3d 690, 694 (Ind. Ct. App. 2015) (disagreeing that the plaintiff's common-law claim was "something other than an attempt to assert a private right of action for failure to report [child] abuse"); Cruz v. TD Bank, N.A., 742 F.3d 520, 522–23 (2d Cir. 2013); Kerusa Co. LLC v. W10Z/515 Real Estate Ltd. Partnership, 906 N.E.2d 1049, 1054–55 (N.Y. 2009).

---

[4] See Shawnee Constr. & Eng'g, Inc. v. Stanley, 962 N.E.2d 76, 80, 86 (Ind. Ct. App. 2011) (holding that a contractual provision ensuring compliance with safety regulations was not enough to find assumed duty), trans. denied; Marks v. N. Ind. Pub. Serv. Co., 954 N.E.2d 948, 956 (Ind. Ct. App. 2011) ("Having safety rules and requirements is insufficient without some affirmative conduct on the part of [the defendant].").

In sum, DCS did not assume a duty of confidentiality on this record. But the Does also asserted—for the first time at the Court of Appeals oral argument—that we should recognize a new duty encompassing these facts under our three-part test in Webb v. Jarvis, 575 N.E.2d 992 (Ind. 1991). We use our discretion to address this belated claim. But see Humphrey v. State, 73 N.E.3d 677, 687 n.2 (Ind. 2017) (deeming an argument waived when raised for the first time at oral argument); Vertucci v. NHP Mgmt. Co., 701 N.E.2d 604, 607 n.1 (Ind. Ct. App. 1998) (declining to address Webb since the plaintiffs "seemingly proceeded solely on the theory that [defendant] gratuitously assumed a duty").

*C. The Webb test yields the same result as the assumed-duty doctrine.*

When determining a duty's existence for the first time, we often look to our three-part test in Webb: balancing (1) the parties' relationship, (2) the foreseeability of harm, and (3) public policy. 575 N.E.2d at 995. Here, Webb imposes no duty.

We acknowledge that John satisfies the foreseeability prong, as retaliation against child-abuse reporters is an unfortunate reality for a town of any size, let alone one where "[e]verybody knows everybody." The other two prongs, however, cut the other way. Like the college in Yost, DCS formed no "special relationship" with the Does by simply communicating a pre-existing rule. 3 N.E.3d at 518.[5] And as for public policy, we cannot ignore that Indiana common law already forecloses a child-abuse *victim* from suing a bystander for failing to report abuse. See, e.g., Borne ex rel. Borne v. Nw. Allen Cty. Sch. Corp., 532 N.E.2d 1196, 1203 (Ind. Ct. App. 1989), trans. denied.

Regrettably, this result does not undo the wreckage. By relaying the statutory requirement of confidentiality and then violating it, DCS exposed an innocent family to harassment and threats.

---

[5] The dissent's "special relationship" analysis—"perhaps the crux" of its argument—focuses on detrimental reliance, arguing that John detrimentally relied on DCS's "extra, explicit and specific assurance" that no one will learn his identity. Slip op. at 1–3. Yet Indiana's common law *already provides* detrimental-reliance theories, and the Does do not satisfy the elements. The assumed-duty doctrine, for example, requires a "specific undertaking"; here there was none. See Yost, 3 N.E.3d at 518. Actual fraud requires a material misrepresentation of "past or existing facts"; here the promise concerned only the future. See Rice v. Strunk, 670 N.E.2d 1280, 1289 (Ind. 1996) (citing Pugh's IGA, Inc. v. Super Food Servs., Inc., 531 N.E.2d 1194, 1197 (Ind. Ct. App. 1988)). And constructive fraud requires either a material misrepresentation of "past or existing facts" or silence "when a duty to speak exists"; here there was neither. See id. at 1284; In re Scahill, 767 N.E.2d 976, 979 (Ind. 2002). Our common law has thus carefully defined liability for promises, and this case—though distressing—does not warrant an ad hoc exception.

Our question on transfer, though, is narrow: should we expand our common law to impose a duty for summarizing a statute? On this record, we decline—seeing no reason why the common law should engulf an essentially statutory protection.

## Conclusion

We do not condone DCS's actions, but find no basis—in either statute or common law—for imposing a duty of confidentiality. We therefore affirm summary judgment for DCS.

Massa, Slaughter, and Goff, JJ., concur.

David, J., concurs in part and dissents in part with separate opinion.

11

**David, J., concurring in part, dissenting in part**

I agree with the majority that John Doe does not have a private right of action under the statute. However, I disagree with the majority's conclusion that he also does not have a common-law negligence claim. I believe under Webb, John may bring a common-law negligence claim.[1] Accordingly, I would reverse the trial court's entry of summary judgment for DCS and remand for further proceedings.

In order to determine whether a duty is owed at common law, three factors must be balanced: (1) the relationship between the parties, (2) the reasonable foreseeability of harm to the person injured, and (3) public policy concerns. Webb v. Jarvis, 575 N.E.2d 992, 995 (Ind. 1991). This three-part balancing test articulated in Webb is a useful tool in determining whether a duty exists in those instances where the element of duty has not already been declared or otherwise articulated. N. Indiana Pub. Serv. Co. v. Sharp, 790 N.E.2d 462, 465 (Ind. 2003). In Goodwin v. Yeakle's Sports Bar & Grill, Inc., we modified the foreseeability component of Webb and held that "for purposes of determining whether an act is foreseeable in the context of duty, we assess whether there is some probability or likelihood of harm that is serious enough to induce a reasonable person to take precautions to avoid it." 62 N.E.3d 384, 392 (Ind. 2016) (internal citation omitted).

Although the majority found otherwise, I believe all three factors weigh in favor of John, not only foreseeability. I believe public policy strongly supports keeping John's information confidential, to protect both the public and, incidentally, the reporting source. If the identity of the reporting source is not protected, this may chill reporters from coming forward at all. This is true despite the statutory mandate for those who have reason to suspect child abuse or neglect to come forward. Indeed, John stated in his deposition that if he were to see child abuse or neglect in the future, he "[doesn't] think [he] could call [DCS] again." (Appellant's App at 46.) Thus, there is strong public policy supporting maintaining confidentiality for the reporting source because the goal is to encourage reporting and thereby, protect children.

---

[1] The majority repeatedly states that there is no common-law duty of confidentiality. I don't disagree. However, I believe that in this case, DCS had a duty to John pursuant to the Webb test.

Whether a special relationship exists between John and DCS is perhaps the crux of the matter. This is a fact-sensitive determination that depends on the level of interaction or dependency between the parties that surpasses what is common or usual. J.A.W. v. Roberts, 627 N.E.2d 802, 810 (Ind. Ct. App. 1994), abrogated on other grounds.

Here, John called DCS to report that he suspected that several neighborhood children were being abused and/or neglected. When John was about to end the call, the DCS employee asked John to provide his name and phone number. John was hesitant to do so. He stated that he did not want anyone to know he was calling. The DCS employee then told John that his information was confidential and promised him that "nobody will find out." John then gave his information, relying on the DCS employee's assurance that his information would not get out. I construe DCS' promise that "nobody will find out" as an explicit assurance that DCS would act on John's behalf. John justifiably *depended*[2] upon the DCS employee's promise to his detriment.

DCS makes several arguments in an effort to recharacterize its interaction with John and argue no special relationship was created, but I do not find them to be persuasive. First, DCS argues that it was not unreasonable to request this information from John and that John was not coerced. I agree.[3] However, it is likely John would not have provided his name had he known his information would be made public. He relied on DCS' assurance that his information would not get out.

Second, DCS argues, and the majority found, that the DCS employee only told John what the statute requires and thus, no special relationship was created. However, DCS did more than just recite the statute. The majority cites Yost and Lanni in support of its position that merely

---

[2] The majority states that Indiana common law already provides detrimental reliance theories and that they do not apply here. However, when determining whether there is a special relationship for purposes of the Webb test, which is separate and apart from the detrimental reliance test, dependency between the parties is considered. See Roberts, 627 N.E.2d at 810. Further, as discussed herein, I disagree with the majority's premise that DCS did not engage in a specific undertaking when it promised John that no one would find out. These facts are not the same as those in Yost and Lanni. Nevertheless, I think that Webb alone gets us to a finding that John has a common-law negligence claim.

[3] I am not suggesting that John would have a claim for actual or constructive fraud here.

2

communicating a rule is not enough to create a special relationship. However, in those cases the defendants did not make any extra or explicit promise to plaintiffs themselves. In Yost, plaintiff sought to hold a school liable for injuries he suffered during a hazing event because the school had disseminated an anti-hazing policy. That case would be more analogous, and therefore, more applicable to this case if the plaintiff in Yost had been hesitant to join the fraternity until someone from the school assured him personally that he would not get hurt. Similarly, the plaintiff in Lanni would be in a different position had he been hesitant to sit in his seat at the fencing match until someone from the NCAA assured him that he would be safe. But in both Yost and Lanni there was no extra or explicit promise made to those plaintiffs beyond the protection afforded by the rule.

Here, John would be in the same position as the plaintiffs in Yost and Lanni, had he given his information without hesitation or if the DCS employee simply made reference to the statutory requirement that his information be kept confidential without the added promise of "[n]obody will find out." In that case, John would not be able to establish a common-law duty like the plaintiffs in those cases. However, I believe the extra, explicit and specific assurance that no one would find out (which is more than what the statute promises) coupled with John's expressed hesitation to provide his information, creates a special relationship between the parties. I believe this added promise to John is not a mere paraphrasing of the statute in light of the circumstances.

Third, DCS argues, and the majority agrees, that because victims of child abuse have no private cause of action, neither do reporters of child abuse. Admittedly, at first blush, this seems like a compelling argument. However, in cases holding there is no private cause of action for victims, the courts did not apply the Webb test to the facts of those cases. Instead, the arguments were focused upon whether the *statute* provided a private cause of action. See, e.g., Borne ex rel. Borne, 532 N.E.2d at 1203 ("An examination of I.C. 31–6–11–1 *et seq.* persuades us that the legislature did not intend to confer a private right of action for any breach of the duty to report imposed by the statute"); Sprunger v. Egli, 44 N.E.3d 690, 691 (Ind. Ct. App. 2015) (addressing the "threshold question of whether the reporting statutes confer a private right of action"). Additionally, in those cases, unlike this one, the would-be reporters did not make any specific or added promise to the parents above what the statute requires. Instead, *only the statute* required the

3

potential reporters to step forward. Here, the DCS employee was required by statute to keep John's information confidential *and* she also promised explicitly that "nobody will find out." It is this extra promise that is beyond the statute that gives rise to the common-law duty in this case. She could have told John that they would do their best but that there were no guarantees his information would not be revealed, that she could not give legal advice or that he was required to report in any case. She could have directed him to or referred to the statute. She could have said any number of things. But instead, she promised him nobody would find out. John then disclosed his identity.

Similarly, as for DCS' argument that allowing a common-law claim to proceed in this case would be an "end run" around the statute, I disagree. When the legislature enacts a statute in derogation of the common law, this Court presumes that the legislature is aware of the common law, and does not intend to make any change therein beyond what it declares either in express terms or by unmistakable implication. Caesars Riverboat Casino, LLC v. Kephart, 934 N.E.2d 1120, 1123 (Ind. 2010) (internal citation omitted); Bartrom v. Adjustment Bureau, Inc., 618 N.E.2d 1, 10 (Ind. 1993) (internal citation omitted). In cases of doubt, a statute is construed as not changing the common law. Bartrom, 618 N.E.2d at 10. Here, the statute at issue, by its plain language, is not meant to foreclose or even address the right of a reporter of suspected child abuse or neglect to bring a negligence action. Instead, the focus of the statute is to set forth guidelines for how reports of child abuse and neglect are to be maintained and kept and who is entitled to access what information. Thus, it does not seem the statute was meant to foreclose a common-law negligence action.

Further, there are situations where the statute provides the only basis for recovery (for instance, Borne and Sprunger discussed above where the claims brought were premised upon violation of the statute only); this is not one of them. Even though John has no private right of action pursuant to the statute, this does not foreclose his common-law claim. As discussed above, the Webb test is employed in negligence cases to determine whether there is a common-law duty of care when no other test has been articulated. See Sharp, 790 N.E.2d at 465. In balancing the Webb factors, I believe John's interaction with the DCS employee in this case was enough to establish a special relationship because John relied upon DCS' promise that "[n]obody will find out." I agree with the majority that the harm to John was foreseeable. I believe public policy

4

strongly supports keeping confidential the information of reporters of suspected child abuse or neglect. I also note that even if we held that DCS owed John a duty as a matter of law such that his common-law claim survives summary judgment, John would still have to prove the other elements of his negligence claim, including proximate cause and damages. See Goodwin, 62 N.E.3d at 386.

Finally, allowing John's common-law claim to proceed is consistent with Article 1, Section 12 of our Constitution and our summary judgment standard. Article 1, Section 12 provides in relevant part: "All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law." And in Hughley v. State, this Court acknowledged that: "Indiana consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims." 15 N.E.3d 1000, 1004 (Ind. 2014). While I acknowledge that this case involves a question of law rather than an issue of fact, allowing the claim to proceed is consistent with our State's constitutional mandate that plaintiffs may seek a remedy and our practice of letting cases proceed to trial. I think this is particularly important in a case like this where John relied upon a promise made by a government actor in response to his reluctance to provide information to the State, fearing consequences for himself and his family. I believe dismissing his claim on summary judgment might send a message that government actors can make false promises in an effort to achieve a desired result and not be held legally accountable when harm comes to the promisee.

For all the reasons discussed above, I would reverse the trial court and let John have his day in court.